United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 21, 1998 Decided January 26, 1999 

 No. 98-3080

 United States of America, 

 Appellant

 v.

 Webster L. Hubbell, Suzanna W. Hubbell, 

 Michael C. Schaufele and Charles C. Owen 

 Appellees

 Appeal from the United States District Court 

 for the District of Columbia 

 (No. 98cr00151-01)

 Kenneth W. Starr, Independent Counsel, argued the cause 
for appellant. With him on the briefs were David G. Barger, 
Joseph M. Ditkoff, and Darrell M. Joseph, Associate Indepen-
dent Counsels. Stephen J. Binhak, Associate Independent 
Counsel, entered an appearance.

 John W. Nields, Jr. argued the cause for appellees Web-
ster L. Hubbell and Suzanna W. Hubbell. K. Chris Todd 
argued the cause for appellee Michael C. Schaufele. With 
them on the brief were Laura S. Shores, Wan J. Kim and 
Drake Mann, counsel for appellee Charles C. Owen.

 J. Douglas Wilson, Attorney, U.S. Department of Justice, 
argued the cause for amicus curiae United States acting 
through the Attorney General.

 Before: Wald, Williams and Tatel, Circuit Judges.

 Opinion for the Court filed Per Curiam.*

 Separate opinion concurring in Part I filed by Circuit 
Judge Wald.

 Separate opinion dissenting from Part I filed by Circuit 
Judge Tatel.

 Separate opinion dissenting from Part II filed by Circuit 
Judge Williams.

 Per Curiam: All defendants--Webster L. and Suzanna W. 
Hubbell, Michael C. Schaufele, and Charles C. Owen--moved 
in the district court to dismiss an indictment charging tax 
evasion and related crimes on the ground that the indictment 
was beyond the prosecutorial jurisdiction of Independent 
Counsel Kenneth W. Starr. In addition, Webster Hubbell 
moved for dismissal on the theory that prosecution necessari-
ly would depend on evidence produced under compulsion and 
used in violation of the Fifth Amendment and the immunity 
granted him under 18 U.S.C. s 6002. The court granted both 
motions. 11 F. Supp. 2d 25 (D.D.C. 1998). We reverse both 
decisions and remand for proceedings consistent with this 
opinion.

 I. Jurisdiction

 On August 5, 1994 this court's Special Division for the 
Purpose of Appointing Independent Counsels ("Special Divi-
sion"), upon request from the Attorney General, appointed 

__________
 * Judge Williams wrote Part I; Judge Wald wrote Part II.

Kenneth W. Starr as Independent Counsel. It gave Indepen-
dent Counsel Starr jurisdiction to investigate

 whether any individuals or entities have committed a 
 violation of any federal criminal law, other than a Class B 
 or C misdemeanor or infraction, relating in any way to 
 James B. McDougal's, President William Jefferson Clin-
 ton's, or Mrs. Hillary Rodham Clinton's relationships 
 with Madison Guaranty Savings & Loan Association, 
 Whitewater Development Corporation, or Capital Man-
 agement Services, Inc.

as well as

 other allegations or evidence of violation of any federal 
 criminal law, other than a Class B or C misdemeanor or 
 infraction, by any person or entity developed during the 
 Independent Counsel's investigation referred to above 
 and connected with or arising out of that investigation

and, more specifically,

 any violation of 28 U.S.C. s 1826, or any obstruction of 
 the due administration of justice, or any material false 
 testimony or statement in violation of federal criminal 
 law, in connection with any investigation of the matters 
 described above.

The Special Division also gave the Independent Counsel 
jurisdiction to seek indictments against and to prosecute

 any persons or entities involved in any of the matters 
 described above, who are reasonably believed to have 
 committed a violation of any federal criminal law arising 
 out of such matters, including persons or entities who 
 have engaged in an unlawful conspiracy or who have 
 aided or abetted any federal offense.

Finally, apparently summarizing the above grants, the Special 
Division ordered that the Independent Counsel have

 prosecutorial jurisdiction to fully investigate and prose-
 cute the subject matter with respect to which the Attor-
 ney General requested the appointment of independent 
 counsel, as hereinbefore set forth, and all matters and 

 individuals whose acts may be related to that subject 
 matter, inclusive of authority to investigate and prose-
 cute federal crimes (other than those classified as Class 
 B or C misdemeanors or infractions) that may arise out 
 of the above described matter, including perjury, ob-
 struction of justice, destruction of evidence, and intimi-
 dation of witnesses.

 These grants of authority were under 28 U.S.C. 
s 593(b)(1), a provision of the Ethics in Government Act, 
which calls on the Special Division, on application of the 
Attorney General, to "appoint an appropriate independent 
counsel and ... define that independent counsel's prosecuto-
rial jurisdiction." Besides that authority--and authority to 
expand an independent counsel's jurisdiction on application of 
the Attorney General, see id.; see also id. at s 592(c)(2) 
(directing Attorney General to follow same procedure as to 
new information)--the Act authorizes an independent counsel 
to ask the Special Division to "refer" to him "matters related 
to the independent counsel's prosecutorial jurisdiction." 28 
U.S.C. s 594(e). As a result of such a request, the Special 
Division on September 1, 1994 made a referral of matters 
concerning Webster L. Hubbell's billing and expense prac-
tices while a member of the Rose Law Firm. Hubbell pled 
guilty to two felony counts concerning these matters in 
October of that year; in the plea agreement Hubbell prom-
ised to cooperate "by providing full, complete, accurate and 
truthful information" to the Independent Counsel about Madi-
son, Whitewater, and Capital Management (hereinafter collec-
tively "Whitewater").

 The Independent Counsel discovered in 1996 that Hubbell 
apparently had begun to receive substantial payments as 
consulting fees in 1994. According to the present indictment, 
these payments included $100,000 from Hong Kong China 
Limited (controlled by the Riady family through the Lippo 
Group) and $62,775 from Revlon.1 Not satisfied that Hubbell 

__________
 1 The relationship between these entities and potential targets of 
the Whitewater investigation should now be familiar. The Riady 
family knew and supported President Clinton from the 1980s, and 

had been fully cooperating, the Independent Counsel sought, 
as he says in his brief, "to determine whether a relationship 
existed between those payments and Mr. Hubbell's testimony 
with respect to Whitewater and Madison-related matters."

 After the investigation had progressed considerably, the 
Independent Counsel sought another s 594(e) referral from 
the Special Division. It granted the referral on January 6, 
1998, encompassing prosecutorial jurisdiction over:

 (i) whether Webster L. Hubbell or any individual or 
 entity violated any criminal law, including but not limited 
 to criminal tax violations and mail and wire fraud, re-
 garding Mr. Hubbell's income since January 1, 1994, and 
 his tax and other debts to the United States, the State of 
 Arkansas, the District of Columbia, the Rose Law Firm, 
 and others; and

 (ii) whether Webster L. Hubbell or any individual or 
 entity violated any criminal law, including but not limited 
 to obstruction of justice, perjury, false statements, and 
 mail and wire fraud, related to payments that Mr. Hub-
 bell has received from various individuals and entities 
 since January 1, 1994.

A federal grand jury indicted Hubbell and the other defen-
dants on April 30, 1998. The indictment alleged conspiracy, 
mail and wire fraud, and various tax offenses, all concerning 
attempts to keep Hubbell's income--including, in material 
part, the consulting fees--from creditors and the IRS.

 On July 1, 1998 the district court granted defendants' 
motion to dismiss the indictment in its entirety as beyond the 
authority of the Independent Counsel. 11 F. Supp. 2d at 27.

__________
contributed large sums to the Democratic National Committee in 
the 1990s. See generally House Gov't Reform and Oversight 
Comm., 105th Cong., Campaign Finance Investigation Interim Re-
port Chapter 4, Part A (1998). Secret Service records indicate that 
James Riady had made several visits to the White House in the 
days before the payment to Hubbell was made. See id. at 14 n.94. 
As for Revlon, it later accommodated another potential witness in a 
different litigation involving possible targets of the Whitewater 
investigation by offering her a job.

 * * *

 The threshold issue before us is the effect, if any, of the 
Special Division's January 6, 1998 referral order ("the refer-
ral"). The Independent Counsel argues that the referral is 
either unreviewable or is entitled to deference from this 
court; defendants--and the Department of Justice in its 
amicus brief--argue that it is irrelevant. No one suggests 
that the indictment is beyond the scope of the referral.

 Referrals from the Special Division are authorized by 28 
U.S.C. s 594(e), which provides: "An independent counsel 
may ask the Attorney General or the division of the court to 
refer to the independent counsel matters related to the 
independent counsel's prosecutorial jurisdiction, and the At-
torney General or the division of the court, as the case may 
be, may refer such matters." The Supreme Court said in 
Morrison v. Olson, 487 U.S. 654 (1988), that "this provision 
does not empower the court to expand the original scope of 
the counsel's jurisdiction ... [but] simply to refer matters 
that are 'relate[d] to the independent counsel's prosecutorial 
jurisdiction' as already defined." Id. at 680 n.18.

 The referral here, then, is simply an explicit determination 
by the Special Division that the original grant of jurisdiction 
implicitly included the matters referred. See In re Espy, 80 
F.3d 501, 507 (D.C. Cir. 1996); see also Morrison, 487 U.S. at 
685 n.22. The Independent Counsel argues for unreviewabili-
ty of this determination by analogy to what he regards as 
comparable decisions of the Attorney General. For such 
unreviewable counterparts he points first to the decisions of 
the Attorney General and her subordinates to have "Main 
Justice" prosecute certain cases rather than a local U.S. 
Attorney's Office and second to the Attorney General's own 
referral authority under s 594(e). In United States v. Tuck-
er, 78 F.3d 1313 (8th Cir. 1996), the Eighth Circuit found the 
latter unreviewable, relying in part on the analogy to the 
Main Justice/U.S. Attorney allocation.

 At least as applied to the Special Division, however, the 
analogy does not hold. Although the Supreme Court upheld 
the independent counsel provisions of the Ethics in Govern-

ment Act against constitutional challenge in Morrison v. 
Olson, the Court, in rejecting the attack on the statute's 
grant of powers to the Special Division, saw it as important to 
say that the s 594(e) power did not empower the Division to 
expand the original grant of jurisdiction. 487 U.S. at 680 
n.18. If the constitutional balance between the branches 
requires this constricted reading of s 594(e), it would be 
startling (though not inconceivable) to find that Article III 
courts are powerless to enforce the boundary. No such 
issues are at stake in the parceling out of jurisdiction between 
Main Justice and the various U.S. Attorneys' offices. And 
Tucker itself poses somewhat different issues, as there the 
executive branch--the one most jeopardized by the indepen-
dent counsel provisions--is the one exercising the s 594(e) 
power. In Tucker, moreover, the Eighth Circuit also relied 
upon particular legislative history indicating that Congress 
intended the Attorney General's s 594(e) referrals to be 
unreviewable, see 78 F.3d at 1317-18, history not paralleled 
as to s 594(e) referrals by the Special Division. We there-
fore find nothing that overcomes the general presumption of 
reviewability.

 But the independent counsel alternatively asks for defer-
ence to the Special Division's s 594(e) referral. We initially 
observe that it is not clear in what constitutional capacity the 
Special Division acts in making a referral. The Independent 
Counsel and the Department of Justice as amicus see refer-
rals as some sort of agency action; defendants, like the 
district court, appear to leave open the possibility that the 
proper analogy is to various other ancillary functions per-
formed by the judiciary--authorizing search warrants, for 
example.2 11 F. Supp. 2d at 30-31. Both analogies seem 
fairly (though not entirely) apt--as one might expect for a 
constitutional hybrid--but they lead us to the same result: 
substantial deference.

__________
 2 Although an argument that the Special Division's interpretation 
of the original grant's legal language is judicial action and presump-
tively unreviewable as law of the case could be at least facially 
plausible, see, e.g., Espy, 80 F.3d at 507, no party has taken such a 
position here.


 Viewed as an agency, the Special Division appears to act 
quite like one glossing its own regulation--a situation in 
which we usually grant substantial deference. See Paralyzed 
Veterans of America v. D.C. Arena L.P., 117 F.3d 579, 584 
(D.C. Cir. 1997) (deference to agency interpreting its own 
regulations at least equal to deference under Chevron). De-
fendants and the Department of Justice as amicus would have 
us reject deference on the ground that the Division operates 
without procedures for critique and comment by outsiders, 
especially by adversely affected parties. But the cases fre-
quently find deference in such safeguard-deprived circum-
stances. See, e.g., Stinson v. United States, 508 U.S. 36 
(1993) (commentary to sentencing guidelines); Consolidation 
Coal Co. v. Federal Mine Safety and Health Review Comm'n, 
136 F.3d 819 (D.C. Cir. 1998) (interpretation implicit in 
Commission's decision to bring enforcement action); Nation-
al Wildlife Fed'n v. Browner, 127 F.3d 1126, 1129 (D.C. Cir. 
1997) (litigating position, as long as it is agency's actual and 
deliberated-upon view); Paralyzed Veterans, 117 F.3d at 581-
82 (supplement to DOJ's ADA Title III Technical Assistance 
Manual).

 The Department of Justice goes on to characterize its chief, 
the Attorney General, as the entity actually responsible for 
the initial grant; from that assumption it reasons that Con-
gress likely intended no deference for the Special Division's 
interpretations of the initial s 593 grant (which is all that 
s 594(e) referrals are). See Martin v. Occupational Safety 
and Health Review Comm'n, 499 U.S. 144, 158 (1991) (Con-
gress may divide various powers as it wishes, subject to 
broader constitutional limitations). But the fact that the 
Attorney General initiates the appointment process and 
makes an initial suggestion of jurisdiction cannot be a basis 
for withholding deference to the Special Division: in the end, 
the order appointing the Independent Counsel and setting out 
his jurisdiction is articulated and issued by the Special Divi-
sion as its own action. See 28 U.S.C. s 593(b)(1); Paralyzed 
Veterans, 117 F.3d at 585 (identity of actual regulation-
drafter irrelevant once regulation is "put out by [the latter 
agency] as its own"). We therefore presume that the Special 


Division's interpretations receive deference, see Martin, 499 
U.S. at 151 ("[W]e presume that the power authoritatively to 
interpret its own regulations is a component of the agency's 
delegated lawmaking powers."), and we find no intent to 
overcome that presumption.

 Morrison, it is true, requires that "the jurisdiction that the 
[Special Division] decides upon must be demonstrably related 
to the factual circumstances that gave rise to the Attorney 
General's investigation and request for the appointment of 
the independent counsel in the particular case." 487 U.S. at 
679. This sets out the constitutional boundary for the Special 
Division's initial action. Even if we assume its extension to 
the Division's later s 594(e) interpretation of that grant, 
nothing helpful to the Department's or defendants' position 
would follow. It would be a curious revival of the discredited 
doctrines of "constitutional fact" and "jurisdictional fact" to 
infer from the constitutionality of the boundary that an 
Article III court (as such) must draw it de novo. See John 
Dickinson, "Crowell v. Benson: Judicial Review of Adminis-
trative Determinations of Questions of 'Constitutional Fact,' " 
80 U. Pa. L. Rev. 1055, 1072-75, 1077-79 (1932) (explaining 
logical errors in doctrine now generally regarded as mori-
bund);3 see also Oklahoma Natural Gas Co. v. FERC, 28 
F.3d 1281, 1283-84 (D.C. Cir. 1994) (Chevron deference appli-
cable even to questions of agency jurisdiction and preemption 
of state power). There is no claim by defendants, moreover, 
that if the disputed referral is within the original grant, it 

__________
 3 In Dickinson's analysis the key error is to suppose, of a fact that 
is said to be a necessary basis of jurisdiction or of constitutionality, 
(1) that it may be known absolutely and (2) that only judicial 
apprehension of the fact can constitute that knowledge. See id. at 
1074. Indeed, as almost any issue could be characterized as a 
jurisdictional or constitutional one, this sort of reasoning would 
swallow deference whole. See id. at 1077-79; see also Mississippi 
Power & Light Co. v. Mississippi ex rel. Moore, 487 U.S. 354, 381 
(1988) (Scalia, J., concurring) ("To exceed authorized application is 
to exceed authority. Virtually any administrative action can be 
characterized as either the one or the other, depending upon how 
generally one wishes to describe the 'authority.' ").

would follow that the original grant was ipso facto outside the 
zone within which it was required to fall, i.e., "demonstrably 
related" to the Attorney General's request.

 Defendants stress additional language in Morrison that, 
they claim, characterizes the referral power of the Special 
Division as "essentially ministerial." 487 U.S. at 681. This 
simply misreads the case--the language specifically refers to 
the provisions listed in its footnote 19: referral is not among 
them.

 The existence of alternative referring agencies, the Attor-
ney General and the Special Division, presents further defer-
ence problems. Compare, e.g., Rapaport v. OTS, 59 F.3d 
212, 216-17 (D.C. Cir. 1995) (no deference in Chevron context 
if more than one agency given authority) with id. at 220-22 
(Rogers, J., concurring in the judgment) (case-by-case deter-
mination of deference in such situations). Is a referral by the 
Attorney General also entitled to deference? We have seen 
that she would not be interpreting her own grant of jurisdic-
tion--the key issue under Martin--but we do not rule out 
other possible grounds for deference or even unreviewability. 
See, e.g., Tucker, 78 F.3d at 1317-19 (legislative history 
indicates that referrals from Attorney General are not re-
viewable). Indeed, as Morrison's concern about the Special 
Division's power is far less applicable to a s 594(e) reference 
by the Attorney General (who would be voluntarily ceding her 
own power), her power here may not be limited to interpret-
ing the original grant; any review of her referral would then 
be in an entirely different context. As either entity may act 
under s 594(e) only at the initiative of the Independent 
Counsel,4 the possibility of conflicting interpretations is one 

__________
 4 The statute also says that the Attorney General may refer a 
matter "on the Attorney General's own initiative," but then provides 
that the Independent Counsel "may accept such referral if the 
matter relates to the independent counsel's prosecutorial jurisdic-
tion," 28 U.S.C. s 594(e), so that in this context the independent 

that the Independent Counsel can freely prevent. Further, a 
grant by one authority and denial by the other need not 
necessarily constitute a conflict: the phrase "may refer" 
appears to include some discretion to decline referral even 
where the authority agrees with the proposed interpretation 
of the initial jurisdictional grant. Indeed, this apparent dis-
cretion suggests the possibility--on which we express no 
opinion--that Congress intended only a grant of referral to 
be authoritative.

 Finally, the claim of zero deference would if accepted 
render s 594(e)'s provision for referral by the Special Divi-
sion meaningless. We do not believe Congress enacted this 
statutory procedure simply to relieve the solitude of the 
Independent Counsel's office.

 The search warrant analogy--brought to mind by the 
defendants' and the Department's stress on the absence of 
adversary procedures--is also instructive. Although made ex 
parte and resolving constitutional questions, a determination 
of probable cause by a federal magistrate or state judge is 
given "great deference." Illinois v. Gates, 462 U.S. 213, 236 
(1983) (internal quotation omitted). And in this context it is 
quite plain that neither the allocation of the power to an array 
of entities nor the possibility of denial by one judge before a 
grant by another stands in the way of deference to any 
particular warrant actually granted.

 Both analyses lead us to deference, but employ different 
linguistic formulations. An agency's interpretation of its own 
regulation is upheld unless "plainly erroneous or inconsistent" 
with the regulation, Bowles v. Seminole Rock & Sand Co., 325 
U.S. 410, 414 (1945), while a search warrant is valid if the 
magistrate had a "substantial basis" for his finding of con-
formity to the applicable standard (probable cause). Gates, 
462 U.S. at 238. Such formulations do not necessarily con-
__________
counsel himself can unilaterally moot the relatedness issue by 
deciding not to proceed.

 We note further that the Attorney General has taken no action 
under s 594(e) in this case. The Independent Counsel did not ask 
her for a referral of the contested matters until October 9 of this 
year--well after the Special Division had already granted its refer-
ral--and she has not yet acted.

flict: each appears to assume a paradigm case rather differ-
ent from the Special Division's s 594(e) referral.

 Although deference to an agency's interpretation of its 
regulations applies where it is simply applying the regulation 
to a specific set of facts, see, e.g., Consolidation Coal Co., 136 
F.3d at 820-21, the deference is plainly focused on the 
agency's norm-defining role.

 It makes sense to view the referral power thus, at least in 
part. Unlike a magistrate issuing a warrant, for example, the 
Special Division is not interpreting a single concept with an 
elaborate precedential pedigree and fairly well-established 
outline: even key terms (such as "related to") are, as terms of 
art go, still novel and quite ambiguous. Further, just it is far 
easier for an agency to develop and maintain a coherent 
interpretive line if its legal interpretations enjoy deference 
from the scattered multitude of judges who review its deci-
sions, see Peter L. Strauss, "One Hundred Fifty Cases Per 
Year," 87 Colum. L. Rev. 1093 (1987) (arguing that this value 
supports the principle of Chevron deference to agency inter-
pretation of statutes), so deference may enable the Special 
Division to do so, as the thousands of magistrates and state 
judges who issue warrants obviously cannot.

 On the other hand, to the extent these recurring concepts 
are fleshed out, the grant of referral also entails some of the 
marshaling and application of facts (or factual assertions) that 
"substantial basis" seems to assume and "plainly incorrect or 
inconsistent" may overlook. In fact, this element and the 
norm-defining element discussed above appear inextricably 
entwined in the Special Division's referral decision.

 We could perhaps attempt to articulate some multiheaded 
standard to govern review of the referral. But this would be 
a futile exercise of judicial ingenuity. As Judge Posner has 
noted, there is deference and non-deference, but further 
multiplication of flavors "reflects the lawyer's exaggerated 
faith in the Word." United States v. McKinney, 919 F.2d 
405, 422 (7th Cir. 1990) (Posner, J., concurring); see also 
NLRB v. Universal Camera Corp., 179 F.2d 749, 753 (2d Cir. 
1950) (L. Hand, C.J.), vacated, 340 U.S. 474 (1951). That is to 

say, we believe that a s 594(e) referral from the Special 
Division falls into the "deference" category. The common 
thread of deference formulations being reasonableness, see 
McKinney, 919 F.2d at 423,5 we believe that the Special 
Division's decision to refer must be upheld if reasonable and 
rejected if not.

 * * *

 The statute sets a minimum on the scope of the jurisdiction 
the Special Division is to grant. We do not think the Special 
Division's referral is unreasonable even if compared to this 
minimum. Indeed, we find the indictments themselves within 
the statutory minimum jurisdiction even without deference to 
the referral.

 The statute begins by directing the Special Division to 
"assure that the independent counsel has adequate authority 
to fully investigate and prosecute the subject matter with 
respect to which the Attorney General has requested the 
appointment of the independent counsel, and all matters 
related to that subject matter." 28 U.S.C. s 593(b)(3) (em-
phasis added). As we shall see, there is an ambiguity in the 
definition of that core "subject matter," but, under the sen-
tence as a whole, the Independent Counsel may prosecute 
anything "related to" it.

 The statute continues:

 Such jurisdiction shall also include the authority to inves-
 tigate and prosecute Federal crimes ... that may arise 
 out of the investigation or prosecution of the matter with 
 respect to which the Attorney General's request was 

__________
 5 More specifically, we have said that "we very much doubt that 
we would defer to an unreasonable agency interpretation of an 
ambiguous regulation." Paralyzed Veterans, 117 F.3d at 584 (em-
phasis in original). Further, although "substantial basis" has not 
received much specific elaboration, the Supreme Court also formu-
lated the test as "substantial evidence," Massachusetts v. Upton, 
466 U.S. 727, 728 (1984), which of course simply refers us to the 
position of a "reasonable factfinder," Allentown Mack Sales and 
Service v. NLRB, 118 S. Ct. 818, 828 (1998).

 made, including perjury, obstruction of justice, destruc-
 tion of evidence, and intimidation of witnesses.

Id. The Independent Counsel may therefore also prosecute 
crimes that "arise out of the investigation or prosecution of" 
the core "subject matter."

 As we noted, there is an ambiguity in just what the core 
jurisdiction is. The Attorney General's initial application to 
the Special Division described the subject matter of the 
appointment as "whether any violations of federal criminal 
law were committed by James B. McDougal or any other 
individual or entity relating to Madison Guaranty Savings & 
Loan Association, Whitewater Development Corporation, or 
Capital Management Services, Inc." Application for the Ap-
pointment of Independent Counsel (1994) (emphasis added). 
It appears unusual in defining the original "core" as criminal 
activity "relating to" the narrowly conceived subject--White-
water.6 One could argue that the "related to" phrases com-
pound: the Independent Counsel would thus be entitled to 
investigate and prosecute crimes "related to" any crimes 
"relating to" Whitewater (or, under the second statutory 
sentence, "aris[ing] out of the investigation" of crimes "relat-
ing to" Whitewater).

 We think in fact such piling on adds little. "Relating to" 
and "arise out of" are themselves such amorphous phrases as 
to make their addition (or multiplication) virtually meaning-
less.

__________
 6 Both the former Special Prosecutor's core jurisdiction and the 
Attorney General's suggested core jurisdiction for the Independent 
Counsel--which the Special Division adopted as the first jurisdic-
tional clause of its original grant--tracked this expansive version of 
"subject matter." See Application for the Appointment of Indepen-
dent Counsel, (Suggested) Statement of Jurisdiction of Independent 
Counsel ("whether any individuals or entities have committed a 
violation of any federal criminal law ... relating in any way to 
James B. McDougal's, President William Jefferson Clinton's, or 
Mrs. Hillary Rodham Clinton's relationships with" Whitewater) 
(emphasis added).


 Rather we think the minimum statutory space must be 
read, as we have said in the past, in accord with the purposes 
of the statute. Its "central purpose ... is to permit the 
effective investigation and prosecution of high level govern-
ment and campaign officials." United States v. Wilson, 26 
F.3d 142, 148 (D.C. Cir. 1994) (emphasis added). Discussing 
the "related to" language of s 593(b)(3), we noted that "the 
scope of a special prosecutor's investigatory jurisdiction can 
be both wide in perimeter and fuzzy at the borders." Id. 
The word "relation" thus comprises more than identical twins. 
And just as a person is "related" not only to his parents and 
children, but to grandchildren and grandparents,7 the fact 
that a crime is in some sense a verbal step or two away from 
the core crime cannot render it unrelated.

 More concretely, the jurisdiction to look into matters "re-
lated to" the core areas of initial inquiry must allow the 
Independent Counsel enough leeway to investigate and prose-
cute such matters as are appropriate for him to effectively 
carry out his mandate. We think such effectiveness cannot 
be secured unless the Independent Counsel is at least able to 
pursue crimes ancillary to the commission or concealment of 
crimes in the core area.

 The rationale for jurisdiction in this case is the same under 
either the "related to" or "arising out of" phrases in the 
statute. If payments Hubbell received beginning in 1994 
were indeed hush money to secure Hubbell's silence vis--vis 
Whitewater, the possible obstruction of justice therein would 
certainly be a crime "relating to" Whitewater, for it would be 
an attempt to cover up the wrongdoing afterward. Both the 
Department of Justice and the defendants admit as much. 
They nevertheless argue that the tax charges here, as well as 
wire fraud and mail fraud aimed at keeping the income from 
the IRS and others who would have resulting claims, are not 
like the "arising out of" crimes specified in s 593(b)(3): "per-
jury, obstruction of justice, destruction of evidence, and intim-
idation of witnesses." The latter, argues DOJ, involve "con-

__________
 7 We do not, however, express an opinion on the applicability of 
this metaphor beyond the second generation.

duct tending to impede the investigation and prosecution of 
other crimes." DOJ Amicus Br. at 34. But any criminal 
conduct that could hide the hush money or amplify its value 
tends to impede investigation and prosecution of the matter 
being hushed up. The less disclosure of the payments, the 
less chance that they and their nature will come to light; and 
the more value Hubbell can squeeze from hush money (by 
nonpayment of taxes or the like), the more chance it will 
succeed in preventing his cooperation.8

 The dissent, disputing these concerns, first argues that the 
Riady and Revlon payments were in fact disclosed in Hub-
bell's 1994 tax return. See Dissent at 13. This appears 
correct. But it does not seem unreasonable to believe that 
the other, unenumerated, "consulting fee" payments--made 
that year and after--were of a piece with the specifically 
detailed ones.9 Further, the dissent's apparent belief that no 
one "could have foreseen" Hubbell's tax evasion scheme, 
Dissent at 14, is hard to grasp. Surely Hubbell could have 
anticipated the advantages of sheltering any hush money 
from the IRS. And at every point where he faced a choice 
(presumably continuously), he could weigh the benefits of 
remaining silent with those of speaking up. Tax evasion, 
both in anticipation and execution, would amplify the expect-
ed benefits of silence and thereby increase the chances that 
the underlying truth--if in fact something was hidden--would 
remain buried.

 Indeed, the history of "aris[ing] out of" indicates a rather 
liberal view as to the prosecution of downstream matters. 

__________
 8 We note that the Independent Counsel, apparently focused on 
the particular procedural implications of "arise out of," did not fully 
articulate in the district court his theory of the tax violations as 
themselves reinforcing the cover-up.

 9 We also realize that not all the tax violations may specifically 
concern the possible hush money payments--that is, the "consulting 
fees." It would be ludicrous, however, if the Independent Counsel, 
in bringing a nondisclosure and evasion case materially concerning 
such payments, were not able to present the full pattern of nondis-
closure and evasion.

The Watergate Special Prosecutor, acting under jurisdiction 
granted by regulation to pursue offenses "arising out of" the 
Watergate burglary or "offenses arising out of the 1972 
Presidential Election for which the Special Prosecutor deems 
it necessary and appropriate to assume responsibility,"10 ob-
tained convictions of H.R. Haldeman, John D. Ehrlichman, 
and John N. Mitchell for their actions in attempting to 
conceal a cover-up, i.e., to cover-up a cover-up--specifically, 
for perjury in making false denials of their efforts to cover up 
the Watergate break-in (one such effort being hush money 
payments to the burglars and E. Howard Hunt, Jr.). See 
United States v. Haldeman, 559 F.2d 31, 59 (D.C. Cir. 1976). 
Though the language is different, we find it implausible that 
Congress intended to give the Independent Counsel a nar-
rower jurisdiction than was exercised by that office's most 
salient model.

 The defense, of course, argues that we cannot consider the 
hush money hypothesis at all. Unlike Watergate, the prose-
cutor has not yet charged anyone named in this indictment 
with the suggested first-level obstruction of justice. Seeming 
to regard non-indictment as the equivalent of true and com-
plete exoneration (i.e., better than acquittal, which is consis-
tent with a case from which the jury could have found guilt), 
defendants effectively claim that unless the bridge crime is 
charged (i.e., the obstruction of justice which is invoked by 
the Independent Counsel), and presumably then proven at 

__________
 10 The mandate, in full, stated that:

 The Special Prosecutor shall have full authority for investigat-
 ing and prosecuting offenses against the United States arising 
 out of the unauthorized entry into Democratic National Com-
 mittee Headquarters at the Watergate, all offenses arising out 
 of the 1972 Presidential Election for which the Special Prosecu-
 tor deems it necessary and appropriate to assume responsibili-
 ty, allegations involving the President, members of the White 
 House staff, or Presidential appointees, and any other matters 
 which he consents to have assigned to him by the Attorney 
 General.

38 Fed. Reg. 30,738-39 (1973).

least in the sense of a case on which reasonable jurors could 
find guilt, it must be assumed completely non-existent.

 This requires too much. It is true that if the Independent 
Counsel had no evidentiary grounds at all for believing that 
the payments were obstructive--or, indeed, if the evidence 
clearly showed that the payments were not obstructive--he 
could not rely on such a jurisdictional theory. But defen-
dants' claim is implausible. The Department of Justice itself 
has recognized that prosecution of a pure non-disclosure 
crime is suitable when it lacks enough evidence to prosecute. 
Its Manual, for example, allows prosecutors to use 18 U.S.C. 
s 1001 (prohibiting false statements) to pursue public corrup-
tion crimes when prosecution for the underlying offense "is 
not practicable." 9A DOJ Manual at 9-1938.123 (1988); see 
also United States v. Blackley, No. 98-3036, slip op. at 9-10 
(D.C. Cir. Jan. 26, 1999). It even directs prosecutors to make 
their decisions based on the nature (in this case, the gravity) 
of this uncharged underlying offense: "It is DOJ policy not to 
prosecute ... under section 1001 unless the nondisclosure 
conceals significant underlying wrongdoing." 9A DOJ Manu-
al at 9-1938.123 (emphasis in original). Perhaps even more 
tellingly, the Internal Revenue Service has established a 
substantial "Special Enforcement Program" to investigate 
people who "derive substantial income from illegal activities," 
IRS Manual s 4566.1(1), presumably on the assumption that 
in the case of many criminals (Al Capone being the most 
notorious example) it is easier to indict and convict them for 
the nonreporting and concealment of their illegal income than 
on the illegality of the income-generating activities. The IRS 
Manual goes on to explain that a person may be targeted for 
Special Enforcement (and thus for a tax case driven by his 
possible involvement in other criminality) if he "is reasonably 
believed to be receiving substantial income from an illegal 
activity that is separate and apart from the alleged tax 
violations." Id. s 4566.1(2)(d). For certain underlying 
crimes, the Manual states a laxer standard. For the category 
"IRS racketeer," for example, all that is required is that he 
be "identified" by a specified high IRS official "as being 


engaged in organized criminal activities; notorious or power-
ful with respect to local criminal activities," etc. Id. 
s 4566.1(2)(a).

 That does not mean, of course, that the Independent Coun-
sel is bound by the specific provisions of various executive 
branch manuals. The dissent faults the Independent Counsel 
for failure to comply with a provision of the DOJ Manual 
requiring IRS approval as a predicate to tax cases. See 
Dissent at 18-19. The dissent rests this complaint on 
s 594(f)(1), which requires the Independent Counsel to follow 
DOJ policy except where "to do so would be inconsistent with 
the purposes of this chapter." 28 U.S.C. s 594(f)(1). It 
suggests that the court wrongly "assume[s]" such inconsisten-
cy. Dissent at 19. But defendants have never raised a claim 
under s 594(f)(1). In the absence of any effort to assert the 
section (and thus any opportunity for the Independent Coun-
sel to defend himself), an inference that its exception applies 
seems fairly grounded: very little independence would be left 
in the office if the Independent Counsel had to run to DOJ or 
other executive branch agencies whenever DOJ established 
such sign-off procedures.11

 Thus, while the Independent Counsel is differently situat-
ed, other agencies' views on the links between crimes provide 
useful guidance. It is unreasonable that the Independent 
Counsel should be hamstrung by the need to prove every 
proposition necessary for jurisdiction by the exacting stan-
dards suggested by the defense. If he were, even his investi-
gations would be severely limited, for the statute gives no 
linguistic hook for requiring a lower standard of proof for 
investigatory jurisdiction. Furthermore he, unlike every oth-
er prosecutor, would be unable to use a prosecution of an 

__________
 11 As Morrison was decided before the "inconsistent with the 
purposes of this chapter" language was added to s 594(f)(1), see 
Pub. L. No. 103-270, s 3(e)(1), 108 Stat. 734 (1994), the dissent's 
reference to the case, see Dissent at 19, is puzzling. Absent a claim 
that the new exception is itself unconstitutional, or that the amend-
ment renders the provision of an independent counsel unconstitu-
tional in its entirety, Morrison appears to have no bearing on our 
interpretation of s 594(f)(1).

easily proved derivative offense as a substitute for prosecu-
tion of another, hard-to-prove offense. For the Independent 
Counsel, a reasonable belief that the linking crime has been 
committed should suffice.

 We are not confronted here with a situation where the 
money at issue is clearly untainted by possible underlying 
obstruction. The timing, sources, and extent of the payments 
make the belief that they were hush money reasonable. That 
suffices.

 * * *

 The Supreme Court upheld the constitutionality of Con-
gress's independent counsel arrangements in Morrison v. 
Olson. It is not for lower court judges to undercut that 
decision by constructions of the Act that prevent this Inde-
pendent Counsel from performing his duty in a manner 
reasonably approximating that of an ordinary prosecutor.

 II. Immunity

 Webster Hubbell invoked his Fifth Amendment privilege 
against self-incrimination in response to a broad-reaching 
subpoena duces tecum issued by the Office of the Indepen-
dent Counsel (the "Independent Counsel" or the "govern-
ment"). He delivered the specified documents only after the 
Independent Counsel had obtained a grant of use-immunity 
pursuant to 18 U.S.C. ss 6002, 6003. Within the personal 
and financial records he produced, the government found 
evidence which provided the keystone for a ten-count indict-
ment. Issued by a federal grand jury on April 30, 1998, the 
indictment alleged that Webster Hubbell, together with his 
wife Suzanna Hubbell, his tax lawyer Charles Owen and his 
accountant Michael Schaufele, had committed various counts 
of fraud and tax evasion. Hubbell moved to dismiss the 
charges brought against him, and in the alternative for a 
Kastigar hearing, see Kastigar v. United States, 406 U.S. 441 
(1972), arguing that the government had violated his Fifth 
Amendment privilege against self-incrimination in obtaining 
an indictment based on his immunized document production. 

Finding that the Independent Counsel had developed its case 
solely on the basis of records that Hubbell had turned over 
under the grant of statutory use-immunity, the district court 
dismissed the indictment with respect to him. As the Inde-
pendent Counsel had only discovered the extent and nature of 
Hubbell's alleged tax violations through his response to a 
government subpoena, the court concluded that the Indepen-
dent Counsel had improperly turned Hubbell into the primary 
witness against himself. The government appeals from this 
ruling, asserting that the district court misconstrued the 
protection accorded by the federal use-immunity statute, see 
18 U.S.C. ss 6002, 6003, as well as the Fifth Amendment's 
privilege against self-incrimination with which it is coexten-
sive. Because the district court utilized an improper legal 
standard in assessing the scope of Hubbell's Fifth Amend-
ment privilege, we vacate its decision and remand for it to 
conduct a hearing as to the extent of the Independent Coun-
sel's knowledge of the records maintained by Hubbell at the 
time the subpoena issued.

A.Background

 In the course of its ongoing investigation into possible 
criminal activity related to Madison Guaranty Savings & 
Loan Association and the Whitewater Development Corpora-
tion, the Independent Counsel learned that Webster Hubbell 
had received payments from entities "associated with" Presi-
dent William Jefferson Clinton for consulting work allegedly 
performed after Hubbell's 1994 resignation from his position 
as the Associate Attorney General. See In re Madison Guar. 
Sav. & Loan Ass'n, Div. No. 94-1 (D.C. Cir. Spec. Div. filed 
Dec. 31, 1997) (application for order of referral to Indepen-
dent Counsel at 3). Through a preliminary investigation 
undertaken on its own initiative, the Independent Counsel 
sought to determine whether the payments were related to 
what it later described as Hubbell's "unwillingness to cooper-
ate fully with the [Whitewater] investigation, as his plea 
agreement obligated him to do." Id. On October 31, 1996, 
the federal grand jury in the Eastern District of Arkansas 
issued a subpoena directing Hubbell to turn over eleven 
categories of business and income related documents, as well 


as personal records of his activities and of his family's fi-
nances, covering the period from January 1, 1993 to the date 
of the subpoena.12

__________
 12 The subpoena commanded production of: a) all documents 
reflecting, referring, or relating to any direct or indirect sources of 
money or other things of value received by Webster Hubbell, his 
wife or children (collectively, the "Hubbell family"), including but 
not limited to the identity of employers or clients of legal or any 
other type of work; b) all documents reflecting or referring to any 
sources of money or other things of value received by the Hubbell 
family, including billing memoranda, draft statements, bills, final 
statements and/or bills for work performed or time billed; c) copies 
of all bank records of the Hubbell family, including statements, 
registers, ledgers, canceled checks, deposit items and wire trans-
fers; d) all documents reflecting time worked or billed by Webster 
Hubbell during the course of any work performed or to be per-
formed; e) all documents reflecting expenses incurred by and/or 
disbursements of money by Webster Hubbell for work performed 
or to be performed; f) all documents reflecting Webster Hubbell's 
schedule of activities, including but not limited to all calendars, 
daytimers, time books, appointment books, diaries, records of re-
verse telephone toll charges, credit card calls, telephone message 
slips, logs, other telephone records, minutes databases, electronic 
mail messages, travel records, itineraries, tickets for transportation 
of any kind, payments, bills, expense backup documentation, sched-
ules, and/or any other document or database that would disclose 
Webster Hubbell's activities; g) all documents reflecting any retain-
er agreements or contracts for employment of the Hubbell family; 
h) all tax returns, tax return information, including but not limited 
to all W-2s, form 1099s, schedules, draft returns, work papers, and 
backup documents filed, created or held by or on behalf of the 
Hubbell family, and/or any business in which the Hubbell family 
holds or has held an interest; i) all documents reflecting work 
performed or to be performed for the City of Los Angeles, Califor-
nia, the Los Angeles Department of Airports or any other Los 
Angeles municipal or governmental entity, Mary Leslie, and/or Alan 
Arkatov, including but not limited to correspondence, retainer 
agreements, contracts, time sheets, appointment calendars, activity 
calendars, diaries, billing statements, billing memoranda, telephone 
records, telephone message slips, telephone credit card statements, 
itineraries, tickets for transportation, payment records, expense 

 On November 19, 1996, Hubbell appeared before a grand 
jury in the Eastern District of Arkansas and formally invoked 
his Fifth Amendment privilege against self-incrimination. 
When questioned, he expressly "decline[d] to state whether 
there are documents within my possession, custody, or control 
responsive to the Subpoena." 11/19/1996 Tr. at 2. The 
Independent Counsel had previously obtained an order signed 
by Judge Susan Webber Wright--under 18 U.S.C. ss 6002, 
6003--directing Hubbell to respond and granting immunity 
"to the extent allowed by law." In re Grand Jury Proceed-
ings, No. GJ-96-3 (E.D. Ark. Nov. 14, 1996) (order compel-
ling production of documents). After receiving immunity, 
Hubbell turned over some 13,120 pages of documents and 
records. The Independent Counsel then led Hubbell through 

__________
receipts, ledgers, check registers, notes, memoranda, electronic 
mail, bank deposit items, cashier's checks, traveler's checks, wire 
transfer records and/or other records of financial transactions; j) all 
documents relating to work performed or to be performed by the 
Hubbell family on the recommendation of Mary Leslie and/or Alan 
Arkatov, including but not limited to correspondence, retainer 
agreements, contracts, time sheets, appointment calendars, activity 
calendars, diaries, billing statements, billing memoranda, telephone 
records, telephone message slips, telephone credit card statements, 
itineraries, tickets for transportation, payment records, expense 
receipts, ledgers, check registers, notes, memoranda, electronic 
mail, bank deposit items, cashier's checks, traveler's checks, wire 
transfer records and/or records of other financial transactions; k) 
all documents related to work performed or to be performed on 
behalf of Lippo Ltd., the Lippo Group, the Lippo Bank, Mochtar 
Riady, James Riady, Stephen Riady, John Luen Wai Lee, John 
Huang, Mark Grobmyer, C. Joseph Giroir, Jr., or any affiliate 
owned or controlled by such individuals or entities, including but 
not limited to correspondence, retainer agreements, contracts, time 
sheets, appointment calendars, activity calendars, diaries, billing 
statements, billing memoranda, telephone records, telephone mes-
sage slips, telephone credit card statements, itineraries, tickets for 
transportation, payment records, expense receipts, ledgers, check 
registers, notes, memoranda, electronic mail, bank deposit items, 
cashier's checks, traveler's checks, wire transfer records and/or 
records of other financial transactions.


a series of questions tied to each of the eleven categories of 
documents requested in the subpoena. With respect to each, 
the Independent Counsel read the relevant paragraph (or a 
summary thereof) and then asked either, "Did you provide all 
those documents?" or "Those are all the records in your 
possession, custody, or control; is that correct?" Hubbell 
answered "Yes" to all eleven queries.13 The Independent 
Counsel closed the session by inquiring "have you searched or 
have you made a thorough search or caused a thorough 
search to be made in response to this Subpoena?" Hubbell 
again replied "Yes." 11/19/1996 Tr. at 11-12.

 The Independent Counsel's search for evidence into wheth-
er Hubbell might have obstructed its Whitewater investiga-
tion revealed potential violations of the Internal Revenue 
Code. Using the contents of the documents Hubbell turned 
over to the grand jury, the Independent Counsel identified 
and developed evidence that culminated in the prosecution at 
issue in this case. On April 30, 1998, a federal grand jury in 
the District of Columbia issued a ten-count indictment alleg-
ing that Webster Hubbell, Suzanna Hubbell, Michael Schau-
fele and Charles Owen14 had conspired to defraud the United 
States Department of the Treasury and Internal Revenue 
Service, the State of Arkansas, the District of Columbia, and 
the Rose Law Firm of monies owed by Webster and Suzanna 
Hubbell (collectively, the "Hubbells").15 The indictment fur-

__________
 13 With respect to paragraphs f and j, Hubbell answered "Yes. 
Subject to the attorney/client privilege." 11/19/1996 Tr. at 9-10.

 14 Michael Schaufele is a certified public accountant, and Charles 
Owen an attorney. Both are personal friends of Webster and 
Suzanna Hubbell, and each provided help in the transactions under-
lying the indictment.

 15 The indictment provides a detailed accounting of the Hubbells' 
financial position from January 1994 through December 1997, sur-
veying their earnings as well as their spending patterns. It docu-
ments all of their employment and investment-related sources of 
income, trust agreements and trust accounts set up in their name, 
as well as their personal bank accounts and IRA accounts. It also 

ther alleged that all four defendants had endeavored to 
obstruct and impede the due administration of the revenue 
laws, in violation of 26 U.S.C. s 7212(a), to evade payment of 
the proper income tax owed by the Hubbells for the calendar 
years 1989-1992 and 1994-1995, in violation of 26 U.S.C. 
s 7201, and committed both mail and wire fraud, in violation 
of 18 U.S.C. ss 1341, 1343. Additionally, Michael Schaufele 
and Webster Hubbell were each charged with preparing and 
presenting a fraudulent tax return, in violation of 26 U.S.C. 
s 7206(2).

 Substantively, the indictment alleged that Webster Hubbell 
had received large payments for consulting services, and then 
conspired to hide this and other income through elaborate 
financial machinations. Inter alia, the indictment claims that 
Hubbell under-reported his 1994 consulting income by ap-
proximately $74,000, and failed to make any payments to-
wards the tax obligations arising out of either the roughly 
$375,000 he did acknowledge earning or the $178,000 already 
owed from the willful tax evasion charge to which he had pled 
guilty on December 6, 1994.16 He also made premature 
withdrawals of more than $233,000 from his Individual Retire-
ment Account ("IRA") without paying the withholding taxes.17 

__________
discusses the tax payments made by the Hubbells, their outstanding 
tax liabilities and other debts, and their consumer purchases.

 16 The Hubbells did not make any tax payments in 1995 either, 
despite incurring an additional tax liability of greater than $112,000.

 17 On each occasion, either Hubbell or Schaufele expressly elected 
that there be no withholding. The final withdrawal involved what 
the Independent Counsel has labeled the "Pension Account Check 
Swap." Hubbell had borrowed approximately $29,000 against his 
profit sharing/pension plan at the Rose Law Firm. Instead of 
defaulting on the loans, which would have required mandatory 
payment of 20% withholding, Schaufele arranged a transaction in 
which the Rose Law Firm paid the $29,000 out of its profit sharing 
plan into Hubbell's IRA account. Hubbell had previously given 
checks to the Rose Law Firm covering the same amount, which 
were cashed directly after the pension money entered Hubbell's 
IRA. Hubbell thereby avoided the automatic 20% withholding 
otherwise accompanying a premature pension plan withdrawal.

In December of 1994 and January of 1995, the Hubbells 
executed three trust agreements--the Webster Hubbell Le-
gal Expense Trust, the Hubbell Children's Education Trust, 
and the Hubbell Family Support Trust--for each of which 
Michael Schaufele opened a separate non-interest bearing 
trust account18 at the Metropolitan National Bank in Little 
Rock, Arkansas. In May of 1996, Michael Schaufele opened 
another non-interest bearing checking account, "for the bene-
fit of Webb and Suzy Hubbell," at Pulaski County Bank in 
Little Rock, and then used the account to make funds avail-
able for the Hubbells' personal spending. In March of 1997, 
Charles Owen prepared Articles of Organization for a compa-
ny entitled the Bridgeport Group, LLC, in which Webster 
and Suzanna Hubbell each owned a forty-nine percent inter-
est and the Hubbell Children's Education Trust the remain-
ing two percent. When Hubbell entered into a book contract 
with William Morrow and Co. later that year, his $49,500 
advance went into the Bridgeport Group's account at Pulaski 
Bank. The indictment broadly alleges that the Hubbells 
utilized these varied financial structures so as to spend down 
their earnings and assets without paying the nearly $900,000 
they owed in taxes to the federal government, the state of 
Arkansas, and the District of Columbia.

 In a July 1, 1998 Memorandum Opinion, the district court 
granted Webster Hubbell's motion to dismiss the indictment 
as violative of the order giving him immunity and compelling 
his response to the grand jury's subpoena duces tecum. It 
found that all of the evidence to be offered by the Indepen-
dent Counsel at trial derived, either directly or indirectly, 
from Hubbell's immunized response. Beginning with the 
proposition articulated in Kastigar v. United States, 406 U.S. 
441, 453 (1972) that "a grant of immunity must afford protec-
tion commensurate with that afforded by the privilege" 
against self-incrimination, the district court sought to discern 
the scope of the protection offered by section 6002 through 

__________
 18 Non-interest bearing bank accounts do not generate Form 
1099s, a copy of which would be sent directly to the Internal 
Revenue Service. See 26 C.F.R. s 1.6049-4.


examining the extent of Hubbell's Fifth Amendment privi-
lege. Drawing from the framework sketched in Fisher v. 
United States, 425 U.S. 391 (1976), and reiterated in United 
States v. Doe, 465 U.S. 605 (1984) (Doe I), it focused upon the 
testimonial and incriminating aspects of the act of production. 
In light of the government's admission that it had utilized 
"the information provided by Mr. Hubbell pursuant to the 
production immunity," United States v. Hubbell, 11 F. Supp. 
2d 25, 34 (D.D.C. 1998), the court found that Hubbell had not 
only communicated the authenticity and his possession of the 
documents, but also implicitly testified as to the very exis-
tence of documents which added to the "sum total" of the 
government's information against him.19 Neither the exis-
tence of the documents nor their contents was a "foregone 
conclusion," Fisher, 425 U.S. at 411, because the Independent 
Counsel had no source of knowledge independent of Webster 

__________
 19 The dissent incorrectly argues that "[h]ere the only interesting 
issue is the 'existence' theory; possession and authentication seem 
properly outside the case." Dissent at 1. The district court found 
that Hubbell implicitly testified as to the existence, his possession, 
and the authenticity of the documents turned over pursuant to the 
compelled act of production. See Hubbell, 11 F. Supp. 2d at 35 
(arguing that the analysis turns on whether Hubbell implicitly 
testified "only that the documents were authentic, or only that they 
were in his possession, or did he also implicitly testify as to their 
very existence?") (emphasis added). The district court did focus 
its discussion on the government's knowledge of the documents' 
existence, but this emphasis likely emerged from its erroneous 
reading of Fisher's existence prong, see discussion infra p. 54, 
together with its reliance on two law review articles arguing that 
where the government is ignorant as to the existence of subpoenaed 
documents, the Fifth Amendment's protection necessarily extends 
to the contents of those documents. See Hubbell, 11 F. Supp. 2d at 
35 n.13 (citing Robert P. Mosteller, Simplifying Subpoena Law: 
Taking the Fifth Amendment Seriously, 73 Va. L. Rev. 1, 41-43 
(1987); Kenneth J. Melilli, Act-of-Production Immunity, 52 Ohio 
St. L.J., 223, 258-60 (1991)). While the court emphasized existence, 
its findings were not so limited. Because we are not just "left with 
'existence,' " Dissent at 1, our discussion speaks in general terms of 
existence, possession and authenticity.

Hubbell's immunized act of production. When it utilized the 
information contained in Hubbell's response to build a case 
against him, the court concluded, the Independent Counsel 
violated Webster Hubbell's rights under the Fifth Amend-
ment and the order of immunity. Accordingly, it dismissed 
Hubbell's indictment.

 B. Discussion

 1. Hubbell's Privilege Against Self-Incrimination

 a. The Basic Fifth Amendment Framework for Com-
 pelled Document Production

 In delineating the proper scope of the Fifth Amendment's 
privilege against self-incrimination, the Supreme Court has 
crafted a framework that requires the presence of each of 
three distinct elements for an individual to make out a claim. 
Whether addressed to oral testimony or to documentary 
evidence, the doctrine necessitates a showing of: i) the com-
pulsion; ii) of testimony; iii) that incriminates. See Fisher, 
425 U.S. at 409 ("the privilege protects a person only against 
being incriminated by his own compelled testimonial commu-
nications").

 Any discussion of the Fifth Amendment's application to the 
production of documents pursuant to a subpoena duces tecum 
necessarily begins with Fisher and Doe I. These cases 
collectively establish the two propositions that structure our 
inquiry. First, Fisher teaches that the Fifth Amendment 
does not protect the contents of pre-existing, voluntarily 
prepared documents. Even if written by the hand of the 
accused, the Fifth Amendment does not extend to writing 
that was not itself compelled. See Fisher, 425 U.S. at 409; 
Doe I, 465 U.S. at 612 n.10 ("If the party asserting the Fifth 
Amendment privilege has voluntarily compiled the document, 
no compulsion is present and the contents of the document 
are not privileged."). While the contents of preexisting docu-
ments are not protected, the Court has acknowledged that 
there are testimonial and potentially incriminating communi-
cations inherent in the act of responding to a subpoena which 
may themselves be protected by the Fifth Amendment. See 

Fisher, 425 U.S. at 410 ("The act of producing evidence in 
response to a subpoena nevertheless has communicative as-
pects of its own, wholly aside from the contents of the papers 
produced."). The enforcement authority that rests behind 
the issuance of any subpoena provides the requisite compul-
sion. See id. at 409.

 Specifically, the act of production communicates at least 
four different statements. It testifies to the fact that: i) 
documents responsive to a given subpoena exist; ii) they are 
in the possession or control of the subpoenaed party; iii) the 
documents provided in response to the subpoena are authen-
tic;20 and iv) the responding party believes that the docu-
ments produced are those described in the subpoena. See 
Fisher, 425 U.S. at 410; Doe I, 465 U.S. at 614 n.13.21 

__________
 20 Although this prong has received little independent discussion, 
the Court's Doe I analysis strongly implies that authenticity refers 
to something other than the party's belief that surrendered docu-
ments match those described in the subpoena. There, the Court 
discusses authenticity in terms of admissibility under Rule 901 of 
the Federal Rules of Evidence, recognizing that the act of produc-
tion could relieve the government of the need to authenticate 
evidence. See Doe I, 465 U.S. at 614 n.13. In this sense, authentic-
ity refers to whether a document is genuine, as opposed to a 
forgery or fabrication. For example, to the extent that Hubbell 
turned over a calendar that recorded how he allocated his time, his 
compelled act of production testifies to the calendar's authenticity.

 21 A number of our sister circuits have reduced these four poten-
tial statements down to two questions: i) whether production 
admits the existence, possession or control of the documents; and 
ii) whether production implicitly authenticates the documents or 
verifies that they are those sought in the subpoena. See, e.g., 
United States v. Fishman, 726 F.2d 125, 127 (4th Cir. 1983); 
United States v. Fox, 721 F.2d 32, 36 (2d Cir. 1983). Given that the 
elements are identical, we see no conceptual difference in describing 
the inquiry as raising four or two potential questions.

 We do reject, however, our dissenting colleague's attempt to 
eliminate outright two of the four statements that, as the Supreme 
Court instructed in Fisher and Doe I, are potentially communicated 
through the act of production. The dissent collapses the first and 

Nevertheless, not every act that communicates one or more of 
these statements rises to the level of a protected communica-
tion under the Fifth Amendment. As Fisher itself illustrates, 
the act of producing documents in response to a subpoena will 
not merit protection unless it communicates something of 
substance to the state. Where the government already has 
the knowledge that would otherwise be conveyed, "[t]he 
question is not of testimony but of surrender." Id. at 411 
(quoting In re Harris, 221 U.S. 274, 279 (1911)).

 In Fisher, the IRS had issued a summons to a taxpayer's 
attorney to produce documents that had been prepared by 
the taxpayer's accountant. At the time the subpoena issued, 
the IRS knew a great deal about the requested documents. 
In each of the two cases jointly considered by the Fisher 
Court, the IRS had highly specific knowledge as to the 
existence of the accountant's work papers as well as to their 
location in the hands of the summoned attorney. See id. at 
394 ("In No. 74-18 the documents demanded were analyses 
by the accountant of the taxpayers' income and expenses 
which had been copied by the accountant from the taxpayers' 
canceled checks and deposit receipts.").22 Moreover, as the 
papers originally belonged to the accountant, they could be 
authenticated independent of the taxpayer's communicative 

__________
third statements--existence and authentication--into the fourth, 
asking only whether the subpoenaed party has linked the docu-
ments produced to those described in the subpoena. See Dissent at 
5 ("the only sense of 'existence' that is covered by the Fifth 
Amendment is that which refers back to the subpoena.... [to] the 
witness's implicit match of the documents with the subpoena's 
description."). This exclusive obsession with what it calls "the 
context of the subpoena," Dissent at 11, disregards the letter as 
well as the logic of Fisher and Doe I, effectively eviscerating the 
Fifth Amendment's act of production privilege. See discussion 
supra pp. 28-29 and note 20; infra pp. 40-45, 60-61.

 22 In the other case, No. 74-611, the documents entailed an 
accounting firm's work papers concerning the taxpayer's books and 
records, retained copies of income tax returns, and retained copies 
of correspondence between the firm and the taxpayer. See id. at 
394.

act of production. The testimony implicit in responding to 
the subpoena was essentially empty, as it did not augment the 
government's preexisting knowledge perceptibly. In these 
circumstances--where the "existence and location of the pa-
pers are a foregone conclusion and the taxpayer adds little or 
nothing to the sum total of the Government's information by 
conceding that he in fact has the papers," and where "the 
Government is in no way relying on the 'truthtelling' of the 
taxpayer to prove the existence of or his access to the 
documents," id. at 411--the Court held that the Fifth Amend-
ment's protections were not implicated. See id.

 Doe I provides an illustrative counterpoint, as the govern-
ment there knew little about the documents it subpoenaed. 
As part of its investigation into corruption in the awarding of 
municipal contracts, a grand jury issued five separate subpoe-
nas to the respondent that collectively sought a wide range of 
business records from his various solo proprietorships. In 
the proceedings below on his motion to quash, the district 
court had concluded that "enforcement of the subpoenas 
would compel respondent to admit that the records exist, that 
they are in his possession, and that they are authentic.... 
The government argues that the existence, possession and 
authenticity of the documents can be proved without respon-
dent's testimonial communication, but it cannot satisfy this 
court as to how that representation can be implemented to 
protect the witness in subsequent proceedings." Id. at 613 
n.11. Similarly, the Third Circuit found nothing indicating 
that the government "knows, as a certainty, that each of the 
myriad of documents demanded by the five subpoenas in fact 
is in the appellee's possession or subject to his control. The 
most plausible inference to be drawn from the broad-
sweeping subpoenas is that the Government, unable to prove 
that the subpoenaed documents exist ... is attempting to 
compensate for its lack of knowledge by requiring the appel-
lee to become, in effect, the primary informant against him-
self." Id. at 613-14 n.12. Finding that the government had 
failed to rebut respondent's claim "by producing evidence that 
possession, existence, and authentication were a 'foregone 
conclusion,' " id. at 614 n.13, the Supreme Court upheld the 

lower court's factual determination that complying with the 
subpoena would involve testimonial self-incrimination. See 
id. at 614.

 Against this settled backdrop, the case at bar presents a 
series of unsettled questions. Our sister courts have yet to 
reach agreement on the particular elaboration and proper 
application of the Fisher and Doe I framework. The degree 
to which a communication must be testimonial, what the Doe 
I Court described as its "testimonial value," 465 U.S. at 613, 
before it will invoke the Fifth Amendment's protections nec-
essarily falls somewhere in between the poles represented by 
Doe I and Fisher. Precisely where on this continuum a given 
document production crosses the rubicon remains undeter-
mined. The same can be said for the requisite quantum of 
incrimination. Finally, since Webster Hubbell produced the 
subpoenaed documents under a grant of immunity, we must 
also determine the extent of the protection afforded by sec-
tion 6002. As Kastigar teaches, that inquiry leads us straight 
back to the scope of the Fifth Amendment privilege. See 406 
U.S. at 453 (immunity must be commensurate with the Fifth 
Amendment's protections). Bearing in mind the Supreme 
Court's prescription that "[t]hese questions perhaps do not 
lend themselves to categorical answers," and that "their 
resolution may instead depend on the facts and circumstances 
of particular cases or classes thereof," Fisher, 425 U.S. at 
410; Doe I, 465 U.S. at 613, we discuss each in turn.

 b. Testimonial Communications

 The court below found that Hubbell's compelled act of 
production required him to make communications as to the 
authenticity, possession, and existence of the documents. See 
Hubbell, 11 F. Supp. 2d at 35.23 Sidestepping this conclusion, 
the Independent Counsel argues that the Fifth Amendment's 
protection should not attach because Hubbell's response to 
the subpoena had insufficient testimonial value. In its view, 

__________
 23 The district court erred, however, in focusing upon the Inde-
pendent Counsel's knowledge of contents of the subpoenaed docu-
ments and the information contained therein. See discussion infra 
p. 54.

the documents' existence was what Fisher described as a 
"foregone conclusion." Accordingly, the actual act of produc-
tion itself--the only compelled communication involved in the 
case of a document subpoena--did not rise to a level of 
communication that would merit the Fifth Amendment's pro-
tection. We disagree.

 The Independent Counsel glosses over what we consider to 
be an essential component of any inquiry into the testimonial 
value of a given act of production--the quantum of informa-
tion possessed by the government before it issued the rele-
vant subpoena. Instead, it makes two separate assertions as 
to why the documents' existence should be deemed a foregone 
conclusion. First, the Independent Counsel claims that the 
most natural reading of Fisher counsels against recognizing a 
testimonial value in the production of ordinary income, finan-
cial, and business records like those subpoenaed here. Since 
people generally possess such records, and since the govern-
ment cannot be expected or required to know with exactitude 
the documents that any individual suspected of wrongdoing 
might have at a given time, the existence of these categories 
of documents, and of corresponding documents falling within 
the categories, should be regarded as a foregone conclusion. 
However, the Independent Counsel's argument is not only 
flawed in logical terms, but it misconstrues Supreme Court 
precedent in this admittedly abstract and under-determined 
area of the law. The argument makes the classical error in 
the field of logic of assuming that the occurrence of future 
events can be logically deduced from observations rooted in 
the past. Empirical knowledge, as David Hume and Ber-
trand Russell teach, can only be a postiori, not a priori. See 
David Hume, Enquiries Concerning the Human Understand-
ing and Concerning the Principles of Morals s IV (L.A. 
Selby-Biggs ed., 1980); Bertrand Russell, The Problems of 
Philosophy, 60-69 (Galaxy 1959) (that the sun rose today and 
as far back as the mind remembers does not establish that it 
will rise tomorrow). Moreover, contrary to the Independent 
Counsel's characterization, the Supreme Court's cases reflect 
such an understanding, and require actual knowledge rather 
than mere inductive generalizations. In Fisher, for example, 
the IRS had precise knowledge of the existence and location 


of accountant's work papers sought through the challenged 
subpoena. The taxpayer had also stipulated to both the 
existence of the documents and that they were those de-
scribed in the subpoena. See Fisher, 425 U.S. at 430 n.9 
(Brennan, J., concurring). The actual production of such 
records accordingly added little, independent of the docu-
ments' substance, to the government's quantum of knowledge. 
Its testimonial value was negligible. In Doe I, by contrast, 
where the government sought a broad range of material 
which could similarly be classified as ordinary income, finan-
cial and business records, the Court held that the act of 
production would have testimonial value meriting Fifth 
Amendment protection.24 While the Court left open the 

__________
 24 The dissent attempts to obscure the Court's holding by arguing 
that "the implications [of Doe I] are quite unclear." Dissent at 5-6. 
"The Court relied explicitly and entirely on the 'two courts' rule," 
and although it rehearsed "the arguments embraced in the courts 
below," it relied "on the anticipated use of the act of production for 
authentication of the documents, i.e., use of an indisputably testimo-
nial aspect of subpoena compliance." Id. The dissent's dual con-
cerns about the continuing viability of Doe I are, respectively, 
unfounded and inaccurate. The Doe I Court did rely upon the "two 
court" rule in upholding the fact-findings of the district and appel-
late courts below, but that reliance in no way undercuts the vitality 
of its legal holding. The "two-court" rule rests upon the division of 
labor within the federal courts, and the Supreme Court's station 
atop this structure as the court of last resort. As the Supreme 
Court noted in Rogers v. Lodge, 458 U.S. 613, 622-23 (1982), the 
case cited for the "two-court" rule in Doe I, reviewing courts do not 
generally operate as finders of fact; they disturb historical fact 
determinations only when clearly erroneous. Supreme Court Rule 
10, which indicates the character of the reasons the Court finds 
compelling when considering a petition for a writ of certiorari, 
testifies to the Court's almost exclusive legal focus. As reasons for 
granting a petition, it lists: inter-circuit splits, conflicts between a 
circuit court and a state court of last resort on an important federal 
question, conflicts between two state courts of last resort on an 
important federal question, and decisions by a circuit court or a 
state court of last resort on an important legal conclusion that 
should be settled by the Court. See Sup. Ct. R. 10. "A petition for 

possibility in future cases that the government could rebut 
such a finding by producing evidence that would establish its 
prior knowledge, the fact that the subpoena sought income, 
financial and business records did not undercut the testimoni-
al value of the act of production. See Doe I, 465 U.S. at 614 
n.13.

 The other cases relied upon by the Independent Counsel 
are equally ineffectual in bolstering its assertions. In United 
States v. Rue, 819 F.2d 1488 (8th Cir. 1987), cited for the 
proposition that courts should assess the testimonial value of 
document production by reference solely to a document's 

__________
a writ of certiorari is rarely granted when the asserted error 
consists of erroneous factual findings or the misapplication of a 
properly stated rule of law." Id.

 Any assertion that the Doe I Court's reliance on the "two-court" 
rule somehow undercuts its precedential force ignores the Supreme 
Court's understanding of its role atop the judicial branch. The 
factual conclusions on which the Court relied--that the witness's act 
of production would involve testimonial self-incrimination by com-
municating the existence, possession, and authenticity of the sub-
poenaed documents--were only relevant to the extent that their 
presence had legal consequences. Despite the dissent's attempt to 
argue it away, Doe I explicitly held that the Fifth Amendment 
protects against such compelled communication, see 465 U.S. at 614, 
and that the subpoena could not be enforced absent a grant of 
statutory use-immunity under 28 U.S.C. ss 6002, 6003. See id. at 
617.

 The dissent's second argument for limiting Doe I is misleading. 
As the dissent points out, the Court did reference "the anticipated 
use of the act of production for authentication of the documents." 
Dissent at 6. In the preceding sentences, however, the Court also 
noted respondent's argument that "by producing the records, he 
would tacitly admit their existence and his possession." Doe I at 
614 n.13. The Court left open the possibility that the government 
could rebut respondent's claim by producing evidence that would 
show this testimonial communication to be a foregone conclusion, 
but its holding clearly embraced all three elements as potentially 
testimonial. Under Fisher and Doe I, all three--existence, posses-
sion, and authentication--are "indisputably testimonial aspect[s] of 
subpoena compliance." Dissent at 6.

category, the Eighth Circuit did not hold--as the Indepen-
dent Counsel claims--that affixing a label of "financial" or 
"business" to characterize a set of records would be sufficient 
to make their existence, possession or authenticity a foregone 
conclusion. While the court did speak in terms of categories 
of documents, it did so because the subpoena itself had sought 
four separate categories of documents in the same way that 
the subpoena here sought eleven categories (or contained 
eleven paragraphs). In Rue, before the contested subpoena 
even issued IRS agents had actually been permitted to exam-
ine monthly and year-end statements relating to Dr. Rue's 
dentistry practice, forms containing individual patient treat-
ment information used to produce those financial statements, 
and appointment books. See Rue, 819 F.2d at 1490. As to 
these three categories, the government had first-hand knowl-
edge of the documents' existence and their whereabouts. As 
to the fourth--patient records detailing services rendered and 
accompanying charges--Dr. Rue's repeated admissions that 
the documents existed and the capacity for independent au-
thentication by other witnesses supported the conclusion that 
any testimony rendered through production was a foregone 
conclusion. See id. at 1493-94.

 United States v. Fishman, 726 F.2d 125 (4th Cir. 1983), 
similarly defies the characterization that the Independent 
Counsel tries to give it; that generalized knowledge about 
particular occupations can make the existence of documents a 
foregone conclusion.25 In support of this contention, the 
Independent Counsel cites language in the Fourth Circuit's 
opinion that "[b]eing business records of Dr. Fishman, their 
existence in the circumstances of this particular case and his 
possession or control are self-evident truths, and hardly need 
to be proven through resort by the Government to the act by 
the owner in turning them over." Id. at 127. However, this 
sentence comes from a paragraph discussing the question of 

__________
 25 Given the nature of Hubbell's consulting work following his 
departure from the Justice Department, the Independent Counsel 
claims it to be a foregone conclusion at the time of the subpoena 
that authentic business records existed and were in Hubbell's 
possession.

potential incrimination, and is immediately preceded by the 
statement that "it is difficult to contemplate how mere exis-
tence, possession or control of the documents amounts to 
incriminating evidence." Id. (emphasis added). Moreover, 
in discussing the testimonial value of the act of production, 
independent from the question of incrimination, the Fishman 
opinion expressly disavows the reading that the Independent 
Counsel attempts to place upon it here. Rejecting the con-
tention that Dr. Fishman had implicitly admitted the exis-
tence and his possession of the documents, the court noted 
that Dr. Fishman's "generalized reference to the subpoenaed 
records acknowledges the existence of a category, but does 
not make any representation or admission as to what docu-
ments fall into it, or whether any particular document is in 
existence." Id. at 127 n.4. We agree with the Fourth Circuit 
that mere reference to a category of records, and the accom-
panying belief that certain individuals should maintain them, 
cannot and does not eliminate the testimonial value inherent 
in the act of production. The government's knowledge must 
have greater depth, and a substantiation that goes beyond 
mere conjecture. See Fox, 721 F.2d at 37 (rejecting argu-
ment from revenue agent's experience as to whether physi-
cian likely maintains records sought via subpoena).

 Second, the Independent Counsel asserts that it actually 
had the requisite knowledge of the existence and Hubbell's 
possession of the documents sought through the grand jury's 
subpoena. We cannot agree on the record before us. The 
Independent Counsel relies upon the fact that Hubbell had 
discussed his consulting work in testimony given before Con-
gress, and that the Department of Transportation Inspector 
General had issued a report which discussed Hubbell's work 
for the Los Angeles Department of Airports. Taken togeth-
er, though, these snippets of information do not come close to 
establishing the existence of the myriad of documents sought 
through the subpoena. The knowledge that Hubbell had one 
or two clients establishes very little else, and certainly does 
not even approach the level of establishing that Hubbell had 
done work for fifteen separate clients, let alone the type of 
records he kept of those activities. The Independent Counsel 


also emphasizes its thorough knowledge of Hubbell's financial 
records as a result of its investigation into charges that 
Hubbell committed tax and mail fraud while working at the 
Rose Law Firm. During the period of time with which the 
Independent Counsel claims familiarity--1989-1992--Hubbell 
worked as the billing partner at a law firm in Little Rock, 
Arkansas. During the period of time underlying this prose-
cution, Hubbell worked in Washington, D.C. as a consultant, 
and served out a term in prison for the mail and tax fraud 
counts to which he previously pled guilty. Unless the Inde-
pendent Counsel can establish its knowledge with a greater 
degree of specificity, the mere allegation that it was once 
familiar with Hubbell's finances does not make the existence 
or possession of the records sought a foregone conclusion. 
See Maggio v. Zeitz, 333 U.S. 56, 65 (1948) (orders enforcing 
a subpoena "should not be issued ... merely on proof that at 
some past time [the summoned documents were] in [the] 
possession or control of the accused party, unless the time 
element and other factors make that a fair and reasonable 
inference").

 i. The Legal Standard

 To formulate an appropriate legal standard as to the de-
gree of prior knowledge needed to render the existence, 
possession or authenticity of documents a foregone conclu-
sion, it is necessary to return to first principles. See Doe v. 
United States, 487 U.S. 201, 209 (1988) (describing Fisher and 
Doe I as applying "basic Fifth Amendment principles" articu-
lated in general terms) (Doe II). As the Supreme Court 
moved away from the doctrine articulated in Boyd v. United 
States, 116 U.S. 616, 634-35 (1886) ("a compulsory production 
of the private books and papers of the owner of goods sought 
to be forfeited ... [compels] him to be a witness against 
himself, within the meaning of the Fifth Amendment to the 
Constitution."), and towards a more literal interpretation of 
the privilege against self-incrimination, see Fisher, 425 U.S. at 
401 ("We cannot cut the Fifth Amendment completely loose 
from the moorings of its language ..."), it jettisoned the 
personal privacy justification in favor of a rationale tied far 
more directly to the nature of government compulsion.


 The core idea can be traced back at least to Justice 
Holmes' decision in Holt v. United States, 218 U.S. 245 (1910), 
in which the Court rejected a Fifth Amendment challenge to 
a witness' testimony establishing that the defendant had 
donned and fit into a blouse worn in a murder for which he 
was being tried. Dismissing what he characterized as an 
"extravagant" allegation, Justice Holmes explained that "the 
prohibition of compelling a man in a criminal court to be 
witness against himself is a prohibition of the use of physical 
or moral compulsion to extort communications from him, not 
an exclusion of his body as evidence when it may be materi-
al." Id. at 252-53. Justice Holmes thereby drew a funda-
mental distinction between government action that extorts 
communication--such action falls within the umbrella of pro-
tection afforded by the Fifth Amendment--and government 
action that merely utilizes the body of the accused as a form 
of evidence--that kind of action falls outside the Amend-
ment's particular orbit. Subsequent cases echo and develop 
this focus upon the Fifth Amendment as a barrier against 
compulsion that acts upon, and requires the exercise of an 
individual's mental faculties for communication.26 Schmerber 
v. California, 384 U.S. 757, 764-65 (1966) (privilege against 
self-incrimination does not extend to a compelled blood sam-
ple), Gilbert v. California, 388 U.S. 263, 265-67 (1967) (privi-
lege does not extend to compelled handwriting exemplar), 
United States v. Wade, 388 U.S. 218, 222-23 (1967) (privilege 
does not extend to compelled voice exemplar), and United 
States v. Dionisio, 410 U.S. 1, 5-6 (1973) (privilege does not 

__________
 26 The dissent argues that we "confuse[ ] the issue with [this] 
rather odd distinction." Dissent at 6. However, as our ensuing 
discussion well indicates, this distinction derives directly from the 
Supreme Court's decisions in Holt and its progeny. See also 
Pennsylvania v. Muniz, 496 U.S. 582, 597 (1990) (distinguishing the 
compelled presentation of identifying physical characteristics from 
the requirement that a suspect "communicate an express or implied 
assertion of fact or belief," as the latter imposes "the 'trilemma' of 
truth falsity or silence and hence the response ... contains a 
testimonial component"). The dissent appears to assume the liber-
ty to write on a clean slate.


extend to compelled voice sample), all rely upon the essential 
distinction between compulsion which operates upon the mind 
by forcing the accused to communicate information or testi-
mony, and compulsion which merely requires him to produce 
his body for inspection. While in each instance the govern-
ment draws evidentiary inferences as a result of the compul-
sion, the Fifth Amendment only protects against those infer-
ences which derive from compelled communication. See 
Pennsylvania v. Muniz, 496 U.S. 582, 593 (1990) (though 
videotape of the defendant exhibiting signs of intoxication 
does not violate the Fifth Amendment, videotape showing the 
defendant's inability to respond to a question about the date 
of his sixth birthday does); Doe II, 487 U.S. at 211 n.10 
(describing the Schmerber line of cases as distinguishing 
between "the suspect's being compelled himself to serve as 
evidence and the suspect's being compelled to disclose or 
communicate information or facts that might serve as or lead 
to incriminating evidence"); Schmerber, 384 U.S. at 765 ("Not 
even a shadow of testimonial compulsion upon or enforced 
communication by the accused was involved either in the 
extraction or in the chemical analysis" of appellant's blood); 
Dionisio, 410 U.S. at 5-6 ("It has long been held that the 
compelled display of identifiable physical characteristics in-
fringes no interest protected by the privilege against compul-
sory self-incrimination.").

 The dissent misreads the letter and logic of Fisher and Doe 
I because it fails to grasp the significance of the Supreme 
Court's distinction between compulsion which uses the body 
as evidence and that which operates upon the mind by 
compelling communicative acts. Instead, our colleague at-
tempts to dissect the testimonial and non-testimonial ele-
ments of providing blood, voice and handwriting samples. He 
argues that in giving blood, a person implicitly says, "This is 
my blood", Dissent at 3; in providing a handwriting sample, 
the accused admits his ability to write and that the exemplar 
is his. See id. at 4. But because in both these cases, it will 
require another witness to identify the accused's voice as that 
of a bank robber, or DNA testing to match the accused's 
blood with stains left at a crime scene, the giving of blood or 


an exemplar will not be considered protected testimony. See 
id. at 3. While undoubtedly true, the point is ultimately 
tangential to the proper inquiry. The real question at issue 
in Holt, Schmerber, Wade, and Gilbert was whether the 
government had merely used the accused's body as a form or 
piece of evidence, or whether the government had to compel 
communicative testimony to obtain the evidence it needed. 
Justice Holmes' Holt opinion likened trying on a blouse to 
simply sitting before the jury and allowing them to compare 
your features to that contained in a photograph of the perpe-
trator. See 218 U.S. at 253. While it can be argued that the 
accused implicitly testified about something in each of the 
cases cited by the dissent--that this is my blood containing 
my unique DNA, that this is my face with all of its character-
istic idiosyncracies, that this is my body with a particular 
shape and size which fits into this blouse--that testimony was 
irrelevant to the Fifth Amendment inquiry because it re-
quired no act of will on his part as to what he would 
communicate. The same reasoning applies to a compelled 
submission to fingerprint analysis. The suspect can be said 
to be communicating that this is my hand and it contains five 
fingerprints unique to my person, but in reality the individual 
has merely been compelled to make himself available as a 
"source of 'real or physical evidence.' " Schmerber, 384 U.S. 
at 764. For purposes of Fifth Amendment analysis, it is 
dispositive that the government has no need to rely upon the 
witness's truthtelling to secure the evidence it seeks.

 The dissent cites to Holt, Schmerber, Wade, and Gilbert for 
the proposition that where the government can draw a link 
between evidence and the accused, independent of the ac-
cused's testimony, the Fifth Amendment does not apply. See 
Dissent at 2-5, 11. None of these cases, read individually or 
taken together, however, stands for this general proposition. 
All of the cases focused on whether the act in question was 
communicative or noncommunicative--whether it relied upon 
the individual's mental faculties and truthtelling capacity or 
merely used the body as a source of physical evidence--and 
not on whether the prosecution could link evidence to the 


accused without relying on his testimony.27 In each, the 

__________
 27 The dissent's almost exclusive focus on blood and handwriting 
stems from its conflation of fundamentally separate inquiries. It 
measures the testimonial character of a compelled subpoena re-
sponse by asking, after the fact, whether produced documents can 
be independently linked back to Hubbell. While these questions go 
to the testimonial value of a given act of production, which is 
properly assessed by asking whether the existence, possession or 
authenticity of the documents was a foregone conclusion, the dissent 
assumes that they instead speak to the prior inquiry into whether 
the act of production is testimonial. Fisher, Doe I, and Braswell 
have already settled this question, teaching that the act of produc-
tion is inherently communicative. Accordingly, these cases repudi-
ate the dissent's assumption.

 The dissent also misreads Baltimore Dept. of Social Servs. v. 
Bouknight, 493 U.S. 549 (1990), conflating its inquiry into whether 
the state could compel production despite Fifth Amendment objec-
tions with a separate and conceptually distinct examination of 
whether that compelled act of production would communicate testi-
mony. In Bouknight, the Court held that a mother could not refuse 
a juvenile court order to produce her child, whom social services 
suspected she abused, by asserting her privilege against self-
incrimination. The Court based its decision on the fact that the 
child--Maurice--had been declared a "child in need of assistance," 
id. at 552, a judicial determination asserting jurisdiction over Mau-
rice and assigning oversight responsibilities to the Baltimore City 
Department of Social Services. Ultimately, the Bouknight Court 
confronted a single question--whether the state juvenile court could 
compel Bouknight to produce her child--and held that Maurice's 
mother had no choice but to comply. Although the Court concluded 
that Bouknight could "not invoke the privilege to resist the produc-
tion order because she has assumed custodial duties related to 
production and because production is required as part of a noncrim-
inal regulatory regime," id. at 555-56 (emphasis added), the dissent 
mistakenly approaches the case as though it rested on a finding that 
production would not be testimonial. Because it does not, see id. at 
561-62 (explicitly referencing Fifth Amendment limitations on using 
any testimonial aspects of Bouknight's compelled producing in 
subsequent criminal proceedings), the dissent's focus upon parsing 
the mental from the physical components of any act producing 

Supreme Court concluded that there had been no testimony; 
accordingly, the Fifth Amendment did not apply. See, e.g., 
Schmerber, 384 U.S. at 761 n.5 (distinguishing acts communi-
cative in nature from the noncommunicative); Doe II, 487 
U.S. at 211 n.10 (the Schmerber line of cases "distinguished 
between the suspect's being compelled to serve as evidence 
and the suspect's being compelled to disclose or communicate 
information or facts that might serve as or lead to incrimina-
ting evidence"). However, as the Schmerber Court went on 
to state, "[i]t is clear that the protection of the privilege 
reaches an accused's communications, whatever form they 
might take, and the compulsion of responses which are also 
communications, for example, compliance with a subpoena 
to produce one's papers." Id. at 764 (emphasis added).

 The rationale underlying the act of production trilogy--
Fisher, Doe I, and Braswell v. United States, 487 U.S. 99 
(1988)28--with its emphasis on compelled truthtelling, emerg-

__________
Maurice is irrelevant to our (and any) general Fifth Amendment 
analysis. See Dissent at 6-8.

 In Bouknight, the Court assumed arguendo that compelled pro-
duction would involve sufficient testimonial incrimination to impli-
cate the Fifth Amendment, see id. at 555--a critical fact our 
dissenting colleague ignores. In fact, to the extent that the Court 
did touch upon the testimonial components of the act of production, 
its minimal discussion reinforces our reading of Fisher and Doe I, 
and directly refutes the dissent's. For example, the Court noted 
that while producing Maurice would implicitly testify to his exis-
tence and authenticity, that communication was "insufficiently in-
criminating." Bouknight, 493 U.S. at 555. Because the state 
already knew of his existence, and presumably his social worker 
could testify as to his identity, both elements were essentially a 
foregone conclusion. See id. (citing Fisher's foregone conclusion 
analysis). See also discussion infra pp. 45-50. The dissent's 
extensive effort to distill contrary principles from Bouknight is 
misguided and unsubstantiated; Bouknight cannot and does not 
bear the meaning that the dissent seeks to assign it.

 28 In Braswell, the Court held that a custodian of corporate 
records could not evade a subpoena seeking records from his 
corporation through asserting his Fifth Amendment privilege 
against self-incrimination. Although Mr. Braswell effectively 

es directly out of this focus upon whether the state operates 
upon a reluctant witness' mental faculties to compel testimo-
ny. See Murphy v. Waterfront Comm'n of New York Har-
bor, 378 U.S. 52, 55 (1964) (rooting the Fifth Amendment 
privilege inter alia in "our unwillingness to subject those 
suspected of crime to the cruel trilemma of self-accusation, 
perjury or contempt ..."); South Dakota v. Neville, 459 U.S. 
553, 563 (1983) (same); Curcio v. United States, 354 U.S. 118, 
128 (1957) (forcing custodian of union records who lacks 
possession to testify as to their whereabouts "requires him to 
disclose the contents of his own mind.... That is contrary 
to the spirit and letter of the Fifth Amendment."). That is, 
the act of producing documents in response to a subpoena 
potentially involves the Fifth Amendment's protections pre-
cisely because the subpoenaed party is forced to undertake 
some communicative act in answering. See Fisher, 425 U.S. 
at 410; Doe I, 465 U.S. at 612. Each of the four potential 
statements that adhere to the act of production--existence, 
possession, authenticity, and the belief that the produced 
documents match the subpoena's terms--can merit protection 
because they entail "the extortion of information from the 
accused, the attempt to force him to disclose the contents of 
his own mind...." Doe II, 487 U.S. at 211 (internal citations 
omitted).29 In terms of the dichotomy articulated in Holt and 

__________
served as the corporation's sole owner and officer--his wife and 
mother were nominal officers so as to satisfy a Mississippi law 
requiring corporations to have three directors--he necessarily oper-
ated in a representative capacity, under the "collective entity" 
doctrine, in his duties as custodian. See 487 U.S. at 110. When 
acting as a corporate agent, the Court held, an individual cannot 
assert his personal Fifth Amendment rights; similarly, the act of 
production can only be used against the corporation and not against 
the custodian. See id. at 118 & n.11.

 29 In Doe II, the Court upheld an order compelling the target of a 
grand jury investigation to sign a series of consent forms authoriz-
ing banks in the Cayman Islands and Bermuda to disclose records 
for any account to which petitioner was a signatory. Since signing 
the consent forms did not involve or imply an assertion of fact or a 


its progeny, they fall on the side of the communicative and 
testimonial.

 In assessing the testimonial value of an act of production, it 
makes sense to reference the anti-extortion principle which 
has become the motivating force of self-incrimination doc-
trine. In light of Fisher, Doe I, and Doe II, we conclude that 
the testimonial value varies directly with the quantum of 
information that the government seeks to extract through 
compelling the expression of the contents of an individual's 
mind and inversely with the quantum of information in the 
government's possession at the time the relevant subpoena 
issues.30 Cf. Muniz, 496 U.S. at 597 ("the cases upholding 
compelled writing and voice exemplars did not involve situa-
tions in which suspects were asked to communicate personal 
beliefs or knowledge of facts ..."). Although the Supreme 
Court has not explicitly stated as much, our conclusion is fully 
in accord with, and even helps to explain, the Court's re-
peated statement that the question of whether tacit aver-
ments are sufficiently testimonial as to merit the Fifth 
Amendment's protection depends "on the facts and circum-
stances of particular cases or classes thereof."31 Fisher, 425 

__________
disclosure of information, the Court concluded that the order did 
not run afoul of the privilege against self-incrimination.

 30 The former constitutes the more important formulation, as it 
ties testimonial value directly to the disparity between the govern-
ment's knowledge and that of the subpoenaed party. It focuses 
directly upon the government's need to access the contents of an 
individual's mind. By contrast, although the government may have 
little information with respect to whether a suspect's DNA or 
fingerprints match those of a suspected culprit, and the government 
will extract a great deal of information from a blood sample or a 
handwriting exemplar, neither probes the contents of one's mind to 
compel testimony. Everything of evidentiary value traces to the 
body as a source "real," as opposed to communicative, evidence.

 31 Our dissenting colleague remarks that "[t]he most confusing 
part of Fisher is the language that the courts have taken to tie 
'foregone conclusion' closely to the 'testimonial' analysis and vice 
versa." Dissent at 3. Because we think that the "foregone conclu-
sion" limitation emerges directly from the logic underlying the act 

U.S. at 410; Doe I, 465 U.S. at 613; Braswell, 487 U.S. at 
103. Moreover, although our sister courts have undertaken 
particular analyses in light of general Fifth Amendment 
principles, the conclusions they have reached in individual 
cases can largely be reconciled with this formulation.32
__________
of production doctrine, we do not share our colleague's confusion. 
Fisher and Doe I state the general proposition that the act of 
producing documents in response to government subpoena commu-
nicates. It provides testimony rather than physical or real evi-
dence, and this testimony comes in four recognized forms. See 
discussion supra p. 29. However, in that subset of cases in which 
the testimonial value of this communication is minimal--exemplified 
by Fisher itself--that testimony will not merit the Fifth Amend-
ment's protection. Where the government need not rely upon the 
truthtelling of the witness, because it has prior knowledge of the 
information that will be communicated through the act of produc-
tion, "no constitutional rights are touched." Fisher, 425 U.S. at 411 
(quoting In re Harris, 221 U.S. at 279). Where all that would be 
communicated is a "foregone conclusion," "the question is not of 
testimony but of surrender." Id.

 The foregone conclusion analysis, which examines the testimonial 
value of the accused's act of production, has nothing to do with the 
general question of whether the act of producing documents in 
response to a subpoena is testimonial. Fisher, Doe I, and Braswell 
all teach that it is. The Court's discussion of handwriting and blood 
samples goes only towards answering this prior question. For 
example, while the Court notes that an accused forced to give a 
handwriting exemplar implicitly admits that he can write and that 
the writing produced is his own, it declares the first admission a 
"near truism" and the second "self-evident." Fisher, 425 U.S. at 
411. "[A]lthough the exemplar may be incriminating to the accused 
and although he is compelled to furnish it, his Fifth Amendment 
privilege is not violated because nothing he has said or done is 
deemed to be sufficiently testimonial for purposes of the privilege." 
Id. (emphasis added). By contrast, the act of production, which is 
inherently testimonial, may or may not be sufficiently testimonial 
for purposes of the privilege. The Fifth Amendment will not 
necessarily apply to all such communications; it "depends on the 
facts and circumstances of particular cases or classes thereof." Id. 
at 410.

 32 Our dissenting colleague contends that these cases can be lined 
up in part "because the factual detail of the cases is so skimpy and 

 In those cases in which our sister circuits have declined to 
recognize the existence of a Fifth Amendment privilege, the 
government has usually had extensive information regarding 
the documents it subpoenaed. While the act of production 
would still force an individual to communicate knowledge and 
to reveal the contents of his mind, the government would in 
no way be relying upon the communication inherent in the 
act. It is only in those instances where the gap separating 
the government's knowledge with respect to the existence, 
possession, location or authenticity of documents from that of 
the subpoenaed party is wide that our sister circuits have 
recognized a testimonial value sufficient to merit the Fifth 
Amendment's protections.

 In United States v. Schlansky, 709 F.2d 1079 (6th Cir. 
1983), for example, the IRS had issued a highly specific 
subpoena reflecting detailed knowledge of the documents it 
sought. In particular, the summons asked for the production 
of "[a] ring binder containing 8" by 12" sheets (approximate), 
3 inches deep, containing cancelled checks, bank statements, 
invoices, receipts glued to the accountants worksheets for the 
years 1976 and 1977." Id. at 1081. Since the existence of the 
binder, its contents, and their possession by Mr. Schlansky 
were not in dispute, and since authentication was available 
from other sources, the Sixth Circuit concluded that Schlan-
sky's response to the subpoena would not involve testimonial 
self-incrimination. The Second Circuit reached a similar 
result in United States v. Praetorius, 622 F.2d 1054 (2d Cir. 
1979), in which the government had subpoenaed a passport in 
relation to its investigation of a heroin importation ring. 
Since the court below had found that the existence and 

__________
the majority's test so elastic." Dissent at 10. However, as will 
become evident from our discussion, the pejorative label "skimpy" 
rightly attaches only to the extent of the government's knowledge in 
those cases where courts have recognized a valid Fifth Amendment 
privilege. In all of the cases we discuss, the factual details are rich 
and revealing. While, for the sake of brevity, we have limited our 
recounting to a relevant summary, we refer our colleague's atten-
tion to the appropriate pages in the federal reporter.


location of the passport were not in question, the Second 
Circuit affirmed its conclusion that the act of production did 
not have sufficient testimonial value to implicate the Fifth 
Amendment. See id. at 1063.

 In re Steinberg, 837 F.2d 527 (1st Cir. 1988), and United 
States v. Clark, 847 F.2d 1467 (10th Cir. 1988) also fall within 
the pattern of cases in which the government's knowledge is 
nearly on par with that of the subpoenaed individual. In 
Steinberg, the government sought a series of notebooks main-
tained by members of Lyndon LaRouche's security staff in 
which they detailed the progress of a federal investigation 
into LaRouche's 1984 Presidential campaign as well as the 
staff's internal planning measures. As a government witness 
had testified to the existence and contents of the notebooks, 
as well as to Steinberg's possession, the court found that the 
subpoena did not implicate the Fifth Amendment. Steinberg, 
837 F.2d at 530. In Clark, an IRS summons sought accoun-
tant's work papers and the personal records that the taxpayer 
had given his accountant, both of which were known to have 
subsequently been given to the taxpayer's attorney. Finding 
the existence of the work papers to be a foregone conclusion, 
and that the underlying records would be reflected therein, 
the Tenth Circuit refused to recognize a Fifth Amendment 
privilege. See 847 F.2d at 1472-73. See also United States v. 
Stone, 976 F.2d 909, 911 (4th Cir. 1992) (in Department of 
Energy investigation into relationship between department 
employees and owner of business receiving DOE contracts, 
where government knew that appellant owned a beach house 
and had sufficient knowledge that he rented the house out 
between 1983 and 1989 to request a list of renters, subpoena 
seeking utility bills and rental records targets documents 
whose existence and possession are a foregone conclusion); 
In re Grand Jury Subpoena Duces Tecum Dated Oct. 29, 
1992, 1 F.3d 87 (2d Cir. 1993) (where defendant has testified 
before SEC as to possession and use of diary, and has 
previously turned over a copy in which government suspects 
adulteration, subpoena for original does not implicate Fifth 
Amendment).


 By contrast, those cases in which our sister courts have 
recognized a Fifth Amendment privilege consistently reveal a 
gross information asymmetry between the government and 
the subpoenaed party, which can be bridged only by getting 
at the contents of the latter's mind. In United States v. Fox, 
721 F.2d 32 (2d Cir. 1983), the IRS issued a wide ranging 
subpoena seeking an expansive array of personal, financial 
and business records of Dr. Martin Fox. At the time, the 
IRS had copies of his 1979-1981 tax returns and a transcript 
of third-party payments to the Foxes during 1979. Rejecting 
the government's contention that the testimonial value of 
producing the subpoenaed documents would be minimal, the 
court reasoned that in seeking all of the books and records of 
the Fox's sole proprietorship, the government had attempted 
"to compensate for its lack of knowledge by requiring Dr. Fox 
to become the primary informant against himself." Id. at 38. 
Since the IRS could establish neither the existence nor the 
authenticity of the records sought, its subpoena implicated 
the Fifth Amendment's protections. In re Grand Jury Pro-
ceedings on February 4, 1982, 759 F.2d 1418 (9th Cir. 1985) 
involved a similarly broad subpoena, demanding personal 
journals, files related to the purchase of fishing boats, stock 
transactions, and receipts. Reasoning that the production of 
documents belonging to and prepared by the subpoenaed 
party would relieve the government of the need to establish 
their existence, possession and authenticity, the court held 
that the act of production would be sufficiently testimonial to 
require protection if incriminating. See id. at 1421. Finally, 
in In re Grand Jury Proceedings, Subpoenas for Documents, 
41 F.3d 377 (8th Cir. 1994), the government subpoenaed all of 
appellants' original records from any business in which they 
owned an interest as well as all evidence of their financial 
transactions for a four-year period. Noting that the subpoe-
na did not describe the requested documents in specific 
terms, the court found that the government had failed to 
establish an independent source of authentication. Focusing 
on the discretionary judgments involved in responding to a 
subpoena, the court pointedly remarked that "the broader, 
more general, and subjective the language of the subpoena, 


the more likely compliance with the subpoena would be 
testimonial." Id. at 380.

 Although the fit is by no means perfect, the cases assessing 
the testimonial value of an act of production form a pattern 
that correlates strongly with the government's need to draw 
from the mental faculties of the responding party. Where 
the information asymmetry is large, and where the govern-
ment's prior knowledge is minimal, the act of production will 
likely communicate either the existence, possession or authen-
ticity of the subpoenaed documents.

 ii. Assessing the Government's Knowledge

 The case at bar highlights a further doctrinal ambiguity, 
which is again tied to elaborating the extent of knowledge 
that the government must have in order to justify a conclu-
sion that the communicative aspects of the act of production 
are a "foregone conclusion" under Fisher and Doe I. Re-
hearsing an argument discussed above, the Independent 
Counsel contends that government knowledge of the exis-
tence and possession of documents should be assessed solely 
through examining categories or classes of documents. While 
it thus argues that the court should measure whether the 
information sought through a subpoena is a foregone conclu-
sion at a high degree of abstraction--speaking in generalized 
terms of business, financial and tax records--the Independent 
Counsel provides no support for its contention. Moreover, 
any instruction to filter review of the government's knowl-
edge through categories is inherently an empty one, for it 
fails to address the recurring level of generality problem. 
See generally, Laurence H. Tribe & Michael C. Dorf, Levels 
of Generality in the Definition of Rights, 57 U. Chi. L. Rev. 
1057 (1990) (discussing the malleability and outcome-
determinative nature of levels of generality); Michael H. v. 
Gerald D., 491 U.S. 110 (1989) (discussing the appropriate 
level of generality at which to define fundamental rights). 
While a useful method of sorting information, categories do 
not present themselves as Platonic forms with inherent shape 
or universal meaning. Rather, defined by reference to their 
particular applications, they can be abstracted upwards or 


downwards (through varying levels of generality) in order to 
embrace or reject concrete instances. See generally Ludwig 
Wittgenstein, Philosophical Investigations (G.E.M. An-
scombe trans., 3d ed. 1968) at ss 137-242 (general concepts 
do not dictate their concrete applications, but rather are 
defined through them). As Doe I well illustrates, the govern-
ment cannot simply subpoena business records and then claim 
the requisite knowledge for purposes of the Fifth Amendment 
by pointing to the existence of a business.33 The Independent 

__________
 33 Nor can the government obtain documents by compelling their 
production, and then claim that the act of production was insuffi-
ciently communicative to merit the Fifth Amendment's protection 
because the papers themselves provide independent evidence of 
their own existence. Where the government had no information as 
to their potential existence prior to the compelled response, its a 
posteriori knowledge is inextricably linked with the communicative 
testimony inherent in the subpoena response.

 The dissent attempts to differentiate two concepts of existence, 
only the first of which it claims to be covered by the Fifth 
Amendment. In the dissent's view, the existence prong of Fisher 
refers only to the statement, made in a given act of production, that 
"Yes, these are the records you described in the subpoena." Dis-
sent at 5. It differentiates this definition of existence from the 
more sweeping view that connotes "in being," id., claiming that the 
latter definition is somehow foreclosed by Schmerber, Wade, and 
Gilbert. The dissent's reading falters on two separate grounds. 
First, and most important, it is explicitly contradicted by Fisher, 
Doe I, and Braswell. In each case, the Supreme Court concluded 
that the act or production "tacitly concedes the existence of the 
papers demanded and their possession or control by the taxpayer. 
It also would indicate the taxpayer's belief that the papers are those 
described in the subpoena." Fisher, 425 U.S. at 410 (emphasis 
added); Doe I, 465 U.S. at 613; Braswell, 487 U.S. at 103. The 
statement which follows the word "also" corresponds directly with 
the dissent's interpretation of the word existence. However, the 
court states what has become known as the "authenticity" prong 
separate from its recognition that the act of production communi-
cates the existence of the documents sought in a subpoena. As far 
as we can tell, our dissenting colleague offers the first opinion 
attempting to read the existence prong of Fisher, reiterated in Doe 

Counsel's assertion that its knowledge of Hubbell's status as 
a consultant and a taxpayer carried with it a concomitant 
awareness of the existence and possession of his consulting 
and tax records similarly falls short. The Fifth Amendment's 
proscription against compelled self-incrimination does not 
hinge on tautology.

 The basic problem with the Independent Counsel's conten-
tion is that it fails to recognize that there are no essential 
classes or categories of information. While the Independent 
Counsel attempts to argue that ordinary business, financial 
and tax records are the appropriate categories through which 
to assess Hubbell's act of production, other courts have 
utilized those terms in a different capacity. The Eighth 

__________

I and Braswell, out of existence. We reject this attempt to render 
an independent part of the Fisher analysis redundant.

 Ignoring the text of Fisher, Doe I, and Braswell, the dissent 
seeks support for its parsimonious definition through a misconstruc-
tion of Schmerber, Wade, and Gilbert. It argues that existence qua 
existence "is as 'self-evident' as the blood and its characteristics in 
Schmerber, the voice samples and their characteristics in Wade, and 
the handwriting and its characteristics in Gilbert." Dissent at 5. 
Our dissenting colleague fails to recognize, however, the legal 
import of the fact that all humans have blood and that nearly all can 
speak and write. In each case, the Supreme Court relied upon this 
self-evident quality to conclude that requiring the accused to pro-
vide a sample merely required the use of his body as physical 
evidence. They were analogous to a "compulsion to submit to 
fingerprinting, photographing, or measurements ..., to appear in 
court, to stand, to assume a stance, to walk, or to make a particular 
gesture," Schmerber, 384 U.S. at 764, because in each case they 
were considered noncommunicative or insufficiently testimonial. 
See discussion supra pp. 39-43. The Supreme Court relied upon 
this distinction between "compelling 'communications' or 'testimo-
ny' " and compulsion that "makes a suspect or accused the source of 
'real or physical evidence,' " id., in articulating the communicative 
elements of the act of production. It concluded that a compelled 
subpoena response testified to existence qua existence. According-
ly, we refuse to join our dissenting colleague's attempt to overturn 
the holding articulated in Fisher, and reiterated in both Doe I and 
Braswell.

Circuit in Rue, for example, used the term to reference the 
various paragraphs of the subpoena in question, see Rue, 819 
F.2d at 1490, while the Sixth Circuit has utilized it as an 
open-ended device for classifying different levels of govern-
ment knowledge. See Butcher v. Bailey, 753 F.2d 465, 470 
(6th Cir. 1985) (inviting the district court to break its assess-
ment of the government's knowledge down into whatever 
document categories it sees). The level of generality problem 
arises precisely because these questions "do not lend them-
selves to categorical answers" and "may instead depend on 
the facts and circumstances of particular cases or classes 
thereof." Fisher, 425 U.S. at 410; Doe I, 465 U.S. at 613.

 Recognizing that the inquiry will always be highly contex-
tual and fact-intensive, we agree with the Second Circuit that 
the government must establish its knowledge of the existence, 
possession, and authenticity of subpoenaed documents with 
"reasonable particularity" before the communication inherent 
in the act of production can be considered a foregone conclu-
sion.34 See In re Grand Jury Subpoena Duces Tecum, 1 F.3d 

__________
 34 The dissent would discredit our holding by asserting that "the 
operational meaning of the 'act of production' doctrine in our circuit 
will largely turn on district courts' discretion in this metaphysical 
classification of prosecutors' knowledge." Dissent at 10. We do 
not share the dissent's disdain for factual inquiries into the extent of 
a government official's knowledge, which forms a large part of 
ordinary judicial decision-making. Under the Fourth Amendment, 
for example, the probable cause determination with respect to both 
arrests and searches depends upon an assessment of the govern-
ment's knowledge as to the likelihood that a suspect has committed 
a crime or that incriminating items will be in a particular place. 
Similarly, district judges weigh the validity of a Terry stop, see 
Terry v. Ohio, 392 U.S. 1, 21-24 (1968), by assessing whether a 
police officer had reasonable articulable suspicion that the suspect 
was potentially involved in criminal activity. A search for weapons 
incident to a Terry stop is also assessed for whether the officer had 
a reasonable, particularized suspicion that the individual was armed. 
See Alabama v. White, 496 U.S. 325, 330 (1990) ("Reasonable 
suspicion ... is dependent upon both the content of information 
possessed by police and its degree of reliability."). To the extent 
that any assessment of the government's knowledge requires some-

87, 93 (2d Cir. 1993). In making this assessment, though, the 
focus must remain upon the degree to which a subpoena 
"invades the dignity of the human mind," Doe II, 487 U.S. at 
219-20 n.1 (Stevens, J., dissenting) and on the quantum of 
information as to the existence, possession, or authenticity of 
the documents conveyed via the act of production.

 In the proceedings below, the court's Fisher/Doe I analysis 
led it to conclude that Hubbell's compelled act of production 
required him to make communications as to the existence, 
possession and authenticity of the subpoenaed documents. 
However, when articulating these factual findings as to the 
Independent Counsel's knowledge of the documents' exis-
tence--as is proper under Fisher and Doe I--the district 
court improperly conflated this Fisher/Doe I inquiry with the 
conceptually separate and temporally subsequent Kastigar 
inquiry.35 See Hubbell, 11 F. Supp. 2d at 36 ("The assertion 
of counsel does not begin to show that the independent 
counsel's knowledge of the documents or their contents was a 
'foregone conclusion' "); id. at 37 n.15 ("The 'existence' prong 
of the Fisher analysis goes to the existence of the information 
contained in the documents, not to the fact that the witness 
keeps records."). Since the Fifth Amendment only touches 
the testimonial aspects of a subpoena response, the district 
court should have independently examined the extent of the 
government's knowledge as to the existence, possession or 
control, and authenticity of the subpoenaed documents--i.e., 
the testimonial components of the act of production. The 
inquiry should have focused upon whether the government 
knew that the documents existed at all, and not upon whether 
the government knew of the existence of the information 
contained therein. See id. at 35 ("The independent counsel 
does not claim that he knew any of the facts relevant to the 
charges in this indictment at the time of the subpoena") 
(emphasis in original). Only the former is communicated 
through the act of production itself.

__________
thing in the nature of a "metaphysical classification," we have no 
doubt that the district courts are up to the task.

 35 Kastigar is discussed infra pp. 59-64.


 As the district court's fact findings relevant to the 
Fisher/Doe I inquiry are inextricably linked with its assess-
ment of the government's substantive knowledge of the al-
leged offenses, we cannot decide on the record before us 
whether Hubbell's act of production had sufficient testimonial 
value to invoke the Fifth Amendment's protections. The 
subpoena speaks in vague terms, and the detail with which it 
goes through the possible forms that the information sought 
could take, see supra note 12, at the very least hints that the 
government had no knowledge as to whether Hubbell main-
tained comprehensive records of the way he allocated his 
time. Moreover, it is unclear how the Independent Counsel 
became apprized of the Pulaski bank account, the three trust 
accounts, the Bridgeport Group, the check swap, and Hub-
bell's early withdrawals from his IRA accounts, each of which 
figure prominently in the indictment.36 See discussion supra 
pp. 25-26. The Bridgeport Group had not been organized, its 
account at the Pulaski Bank had not been opened, and 
Hubbell had neither signed a book contract with William 
Morrow and Company, Inc., nor received his advance on the 
day the subpoena issued. The extent of the Independent 
Counsel's knowledge of Hubbell's recordkeeping practices is 
also uncertain. On remand, the district court should hold a 
hearing in which it seeks to establish the extent and detail of 
the government's knowledge of Hubbell's financial affairs (or 
of the paperwork documenting it) on the day the subpoena 
issued. It is only then that the court will be in a position to 

__________
 36 According to the district court, the Independent Counsel con-
ceded in oral argument that it "learned of the Bridgeport Group, 
the ['for the benefit of'] account at Pulaski County Bank, and the 
'pension account check swap' charged in the indictment only 
through the documents." Hubbell, at 35. By contrast, the Inde-
pendent Counsel asserts that it discovered the account and the 
check swap through interviews with and documents produced by 
Michael Schaufele, the Rose Law Firm, and financial institutions. 
See Appellant's Br. at 44-45 n.9. On remand, the Independent 
Counsel bears the "heavy burden" of demonstrating a source of 
knowledge completely independent from and untainted by the com-
pelled act of production. See Kastigar, 406 U.S. at 461-62; Bras-
well, 487 U.S. at 117.

assess the testimonial value of Hubbell's response to the 
subpoena. Should the Independent Counsel prove capable of 
demonstrating with reasonable particularity a prior aware-
ness that the exhaustive litany of documents sought in the 
subpoena existed and were in Hubbell's possession, then the 
wide distance evidently traveled from the subpoena to the 
substantive allegations contained in the indictment would be 
based upon legitimate intermediate steps. To the extent that 
the information conveyed through Hubbell's compelled act of 
production provides the necessary linkage, however, the in-
dictment deriving therefrom is tainted.

 c. The Question of Incrimination

 Under the third prong of the Fisher and Doe I analysis, 
compelled testimony must be incriminating before it merits 
Fifth Amendment protection. See Fisher, 425 U.S. at 409 
("the privilege protects a person only against being incrimi-
nated by his own compelled testimonial communications"). 
The mere assertion of the privilege by the party whose 
testimony the government seeks is insufficient; "his say-so 
does not of itself establish the hazard of incrimination. It is 
for the court to say whether his silence is justified." Hoff-
man v. United States, 341 U.S. 479, 486 (1951). With respect 
to a subpoena for documents, the privilege cannot be invoked 
merely because the subpoenaed items contain incriminating 
information; the act of production must communicate and 
incriminate. See Fisher, 425 U.S. at 410. To have "an 
incriminating effect," Doe I, 465 U.S. at 612, the party 
claiming the privilege must be "confronted by substantial and 
'real,' and not merely trifling or imaginary, hazards of incrim-
ination." Id. at 614 n.13 (citations omitted). See also Butch-
er v. Bailey, 753 F.2d at 470 (showing that document produc-
tion would incriminate "will be sufficient if the court can, 'by 
the use of reasonable inference or judicial imagination, con-
ceive a sound basis for a reasonable fear of prosecution' ") 
(quoting In re Morganroth, 718 F.2d 161, 169 (6th Cir. 1983)).

 Breaking the act of production down into its individual 
testimonial components, the Independent Counsel argues that 
an admission of either the existence or possession of "ordi-


nary" business and financial records can almost never be 
incriminating. Similarly, the implicit authentication of docu-
ments would only incriminate were a subpoena to be phrased 
in such a way as to expressly request production of the 
instruments of criminality. We disagree, as both logic and 
Supreme Court precedent rebut the claims of any such nig-
gardly interpretation. First, the Fifth Amendment's protec-
tions cannot depend upon such trivial semantic distinctions 
that the government can sidestep its application by request-
ing "all income records" instead of "all incriminating income 
records." Artful phrasing does not suffice. Moreover, Doe I 
and Doe II belie such a narrow reading of the Fifth Amend-
ment's protections. In Doe I, the Supreme Court found, on 
the basis of the findings presented, that Doe faced a "real and 
substantial" risk of incrimination were he to produce the 
documents sought in the government's subpoena-a subpoena 
seeking ordinary business records, not "incriminating" busi-
ness records. See 465 U.S. at 614 n.13. As the government 
had no independent knowledge of the existence or his posses-
sion of the documents listed in the subpoenas at issue, and 
since the act of production would tacitly admit their existence 
and his control over them, and provide a source of authentica-
tion, the court found the threat of incrimination to be "clear." 
See id. A cursory comparison of the subpoena at issue in Doe 
I with that of the case at bar reveals marked similarities, see 
id. at 607 n.1, and we think it equally clear that Hubbell faced 
a real and substantial threat of incrimination in responding. 
It is hard to divine another reason why the Independent 
Counsel would have sought an order of immunity in the first 
place.

 Doe II's discussion of the incrimination requirement rein-
forces our conclusion. Although the decision in Doe II turned 
on the question of whether signing a general release form 
involved an assertion of fact, the Court also discussed the 
proper shape of the incrimination inquiry. The Kastigar 
Court, it argued, "implicitly concluded that the privilege 
prohibits 'the use of compelled testimony, as well as evidence 
derived directly and indirectly therefrom.' 406 U.S. at 453. 
The prohibition of derivative use is an implementation of the 


'link in the chain of evidence' theory for invocation of the 
privilege, pursuant to which the 'compelled testimony' need 
not itself be incriminating if it would lead to the discovery of 
incriminating evidence." Doe II, 487 U.S. at 208 n.6.

 In the present case, it appears that Hubbell's testimony 
likely involved both direct and indirect incrimination. Ac-
knowledging the existence of an interest-bearing checking 
account the income from which the subpoenaed party had 
failed to report on his tax returns would directly incriminate; 
it would inform the government of a known source of unre-
ported income. See United States v. Argomaniz, 925 F.2d 
1349, 1354 (11th Cir. 1991) (where defendant failed to file tax 
returns for a series of years, admitting the existence of 
documents relating to income through production would es-
tablish essential elements of criminal failure to file a tax 
return). If Hubbell had records of that account in his 
possession or control, that fact could further incriminate. See 
Smith v. Richert, 35 F.3d 300, 304 (7th Cir. 1994) (as the 
mere turning over of 1099s and W-2s in response to a 
subpoena could eliminate defense of lack of knowledge or 
possession, it is incriminating). Similarly, in acknowledging 
the existence of the Bridgeport Group and its bank account at 
Pulaski Bank, Hubbell provided a link in the chain of evidence 
used by the Independent Counsel to substantiate the criminal 
charges against him--an instance of indirect incrimination.

 Given the procedural posture of this case, it would be 
premature for us to review the incrimination question any 
further at this juncture. Until the district court determines 
on remand precisely what testimony Hubbell provided 
through his act of production, focusing on the extent of the 
government's knowledge as of the date of the subpoena and 
on whether Hubbell's testimony added "to the sum total of 
the government's case against him," United States v. Edger-
ton, 734 F.2d 913, 921 (2d Cir. 1984) (quoting Fisher, 425 U.S. 
at 411), it cannot make the appropriate fact findings as to 
what extent that testimony is incriminating. See Doe I, 465 
U.S. at 614 (whether a compelled act of production is incrimi-
nating is a question of fact). In conducting this inquiry, the 
district court should be guided, as the Supreme Court coun-


seled in Hoffman v. United States, 341 U.S. at 487, by its 
particular perceptions of the specific and unique facts of the 
case.

 d. The Upshot of Immunity

 A grant of statutory immunity under 18 U.S.C. ss 6002, 
6003, extends as far as the Fifth Amendment privilege it 
supplants. It "leaves the witness and the prosecutorial au-
thorities in substantially the same position as if the witness 
had claimed the Fifth Amendment privilege," and is "coexten-
sive" with the Fifth Amendment's protections. Kastigar, 406 
U.S. at 462. Since the district court erred in assessing the 
testimonial value of Hubbell's document production, it con-
ducted its inquiry into the effect of Hubbell's statutory immu-
nity against a faulty backdrop. On remand, the court should 
assess the impact of the immunity order in light of its new 
fact findings with respect to the government's prior knowl-
edge and the quantum of information it extracted from "the 
state of mind, memory, perception, or cognition of the wit-
ness." Braswell, 487 U.S. at 126 (Kennedy, J., dissenting). 
Although this inquiry will be fact-intensive, the district court 
should bear in mind Kastigar's teaching that "a grant of 
immunity must afford protection commensurate with that 
afforded by the privilege, [although] it need not be broader." 
406 U.S. at 453. The precise contours of Hubbell's Fifth 
Amendment rights, therefore, will be dispositive.

 Intervening in this case, the United States, acting through 
the Attorney General, has proffered a particular reading of 
the Fifth Amendment's intersection with compelled produc-
tion which we believe merits some discussion. Like the 
Independent Counsel, the United States draws a sharp dis-
tinction between the testimonial components of the act of 
production and the contents of those documents, essentially 
ruling out the possibility that the prohibition on the direct or 
indirect use of a party's compelled testimony could extend to 
reach the contents of the documents he turns over. Instead, 
it invites the court to compare what the government learns 
from the act of production with what it would know if the 
documents in question just appeared on its doorstep. That 


intellectual exercise, it argues, separates the information con-
veyed through the act of production with what could be 
deciphered from the records themselves. See Intervenor's 
Br. at 42; Dissent at 11. Since Kastigar instructs that the 
government can introduce the fruits of immunized testimony 
provided that it can meet "the heavy burden of proving that 
all of the evidence it proposes to use was derived from 
legitimate independent sources," 406 U.S. at 461-62, the 
documents themselves can serve as that independent source 
of the information communicated by their production. Pro-
vided that the government does not mention the mechanics 
through which it obtained those documents, and that the 
documents are sufficiently self-explanatory and self-
referential to establish their own nexus with the defendant, 
the government would be free to use the subpoenaed docu-
ments in making its case against the defendant.37 We dis-
agree.

 Although the Fisher Court observed that "[t]he 'implicit 
authentication' rationale appears to be the prevailing justifica-
tion for the Fifth Amendment's application to documentary 
subpoenas," 425 U.S. at 412 n.12, the Court explicitly and 
repeatedly acknowledged that the act of production also 
communicates existence and possession. See id. at 412; Doe 
I, 465 U.S. at 613; Doe II, 487 U.S. at 209; Braswell, 487 
U.S. at 103. The analytic tool offered by the United States, 
however, reads both of these testimonial components out of 
existence. While the government may be able to establish 
the authenticity of the documents independently, whether in 
terms of their own self-reference or the testimony of a 
witness familiar with them, the magical appearance of the 

__________
 37 The Independent Counsel has made a similar argument, claim-
ing that it has not and will not trample Hubbell's Fifth Amendment 
rights because it has no need to introduce Hubbell's actual docu-
ments at trial. Accordingly, the Independent Counsel asserts that 
it can obviate Hubbell's testimony as to the existence, possession, 
control, and authenticity of the subpoenaed documents. See Appel-
lant's Br. at 12 ("the government has made no use of Mr. Hubbell's 
act of production in the course of developing the charges in the 
indictment.").

documents obviates the need for prior knowledge that the 
documents actually exist. Yet "Kastigar does not prohibit 
simply 'a whole lot of use,' or 'excessive use,' or 'primary use' 
of compelled testimony. It prohibits 'any use,' direct or 
indirect." United States v. North, 910 F.2d 843, 861 (D.C. 
Cir. 1990). Once the documents appear and are examined, 
such that their existence enters the consciousness of the 
prosecutor, the United States has offered no means through 
which the government can establish that its evidence "is not 
directly or indirectly derived from such testimony" as to their 
existence. United States v. North, 920 F.2d 940, 946 (D.C. 
Cir. 1990) (emphasis in original).

 The intellectual exercise suggested by the Justice Depart-
ment and embraced by our dissenting colleague, see Dissent 
at 11, essentially eviscerates the act of production doctrine, as 
well as the Fifth Amendment protection it secures. To offer 
a counter-hypothetical, assume that the government grants 
immunity to a murder suspect, compelling him to incriminate 
himself verbally. Under compulsion, the accused admits that 
he stabbed the victim, and that he buried the murder weapon 
in a particular place that would not have been discovered 
through any alternative line of government investigation. 
When the police go to this remote location, they find a knife. 
Forensic testing reveals it not only to be the murder weapon, 
but also to contain blood stains and a set of fingerprints that 
match our suspect's. Would we allow a prosecution to be 
based on the incriminating knife, under our colleague's "man-
na from heaven" scenario, by assuming that it miraculously 
appeared in the district attorney's office? Could it be used as 
evidence so long as no-one testified as to how they learned of 
its whereabouts? Once the accused has already directed the 
government to the knife, should we limit his Fifth Amend-
ment privilege by hypothesizing after the fact--as an intellec-
tual exercise--that the knife could have been linked to the 
accused because of the blood or fingerprints on it, or because 
the prosecutor conceivably could have received an anonymous 
report describing the location of the weapon? Could the 
prosecutor, consistent with the Fifth Amendment, bring 
charges based upon any independent linkage between the 


weapon and the accused that it can divine after the fact? The 
questions answer themselves. They also rebut the theory of 
the act of production doctrine proffered by the Justice De-
partment and the dissent. Since the Self-Incrimination 
Clause has always been understood to refer to testimony in 
all of its forms, whether communicated by voice or through 
physical acts, see Doe II, 487 U.S. at 209-10 n.8 ("Petitioner 
has articulated no cogent argument as to why the 'testimonial' 
requirement should have one meaning in the context of acts, 
and another meaning in the context of verbal statements."); 
Muniz, 496 U.S. at 595 n.9 (definition of testimonial communi-
cation "applies to both verbal and nonverbal conduct"), the 
protection it accords to verbal communications must extend to 
the testimony conveyed through a compelled act of produc-
tion.38

 Now suppose a variation of our hypothetical, in which the 
police discover a victim's body in the basement of a large 
apartment building, and an autopsy establishes stabbing to be 
the cause of death. Lacking any clues, a grand jury issues a 
subpoena to every resident in the building, asking each to 
produce "all knives and other forms of cutlery that are now, 
or in the preceding month have been, in your possession or 
control." The residents object en masse, asserting inter alia 
their Fifth Amendment privilege against self-incrimination. 
After the prosecutor obtains an order compelling production 
and granting immunity to the maximum extent allowed by 
law, the residents comply with the subpoena. Among the 
recovered knives, the police discover the murder weapon. 
The prosecutor indicts its owner for murder. The defendant 

__________
 38 Our dissenting colleague recognizes that the weapon is the 
tainted fruit of immunized oral testimony, see Dissent at 11, the 
inevitable conclusion under settled law that we constructed our 
hypothetical to reflect. The taint remains, however, regardless of 
whether the knife can be independently linked back to the accused 
by some stretch of the imagination. The dissent's post hoc "manna 
from heaven" scenario cannot purge it. Where the government 
makes the same use of compelled document production, depending 
on the facts and circumstances of the particular case, those docu-
ments can be equally tainted.

moves to dismiss the indictment, claiming that his immunized 
subpoena response testified as to the existence, his posses-
sion, and the authenticity of the knife he produced. Having 
handed the government the murder weapon, and provided the 
explicit link between it and himself, can the accused neverthe-
less be prosecuted consistent with the Fifth Amendment 
provided that the government finds some independent way to 
link him with the knife? If our protagonist has once again 
left behind fingerprints and traces of his blood, could they be 
used as evidence, together with the knife, so long as no one 
testified as to the means of recovery? In the scenario we 
paint, where the government had no evidentiary knowledge 
independent of that derived, directly and indirectly, from 
testimony communicated through compelled production, Fish-
er, Doe I, Doe II, Kastigar and Braswell clearly repudiate 
any attempt to do so. They collectively teach that the scope 
of the Fifth Amendment's protection cannot be measured by 
merely imagining that our knife appeared, like manna from 
heaven, in the grand jury room.

 In a case such as the present one, in which the govern-
ment's knowledge of the existence or possession of the exten-
sive documentation sought via subpoena appears scant at 
best, the United States' hypothetical about finding the papers 
on its doorstep fails to capture the true nature of the Fifth 
Amendment's protection against the government probing the 
mind of an accused in order to ascertain evidence it can use to 
convict him. Where the testimonial value of document pro-
duction is high, and the government obtains a large quantum 
of information directly from the witness' mental faculties, the 
government labors under "a heavy burden of proving that all 
evidence it seeks to introduce is untainted by the immunized 
act of production." In re Sealed Case, 791 F.2d 179, 182 
(D.C. Cir. 1986) (internal citations omitted). If the govern-
ment did not have a reasonably particular knowledge of 
subpoenaed documents' actual existence, let alone their pos-
session by the subpoenaed party, and cannot prove knowledge 
of their existence through any independent means, Kastigar 
forbids the derivative use of the information contained therein 
against the immunized party. See 406 U.S. at 453 ("Immuni-


ty from the use of compelled testimony, as well as evidence 
derived directly and indirectly therefrom, ... prohibits the 
prosecutorial authorities from using the compelled testimony 
in any respect, and it therefore insures that the testimony 
cannot lead to the infliction of criminal penalties on the 
witness."). Accordingly, should the Independent Counsel 
prove unable to meet the requisite evidentiary burden, the 
contents of those documents will be inadmissible. See Sealed 
Case, 791 F.2d at 182 ("Thus, if in fact appellee's privilege in 
the act of production cannot be protected without excluding 
the contents of the tapes (a point on which we express no 
opinion) the District Court has the authority to prevent the 
government from referring to or introducing those con-
tents.").

 "The decision to seek use immunity necessarily involves a 
balancing of the Government's interest in obtaining informa-
tion against the risk that immunity will frustrate the Govern-
ment's attempts to prosecute the subject of the investigation." 
Doe I, 465 U.S. at 616. Unless the Independent Counsel can 
establish its knowledge of the existence and possession of the 
documents sought in the subpoena with greater detail and 
particularity, it will have to live with the consequences of its 
decision to compel production.

 III. Conclusion

 For the reasons above, we vacate the district court's judg-
ment and remand for further proceedings in light of this 
decision.

 So ordered.


 Wald, Circuit Judge, concurring in Part I: I believe that a 
reasonable construction of the original mandate shows that it 
is "demonstrably related" to the tax evasion and asset con-
cealment prosecutions in dispute here. That, however, is only 
because, as the panel opinion makes clear, at least some of 
the consulting monies Hubbell received in the years 1994-
1997 may have been tainted as hush money. "The timing, 
sources, and extent of the payments make the belief that they 
were hush money reasonable." Panel Opinion ("Panel Op.") 
at 20. Thus, manipulation of all monies received during that 
period may have been related to the concealment of any 
tainted money--money, that is, received in return for ob-
structing the Independent Counsel's Whitewater investiga-
tion. Panel Op. at 15-18. In the face of these circumstances, 
I disagree with the dissent's conclusion that the Independent 
Counsel's failure to bring an indictment on the hush money 
allegations, either first or contemporaneous with the tax 
violations, means that no "credible evidence" of any wrongdo-
ing exists. Dissenting Opinion ("Diss. Op.") at 16-17.

 The simple fact that no prior or simultaneous indictment 
for obstruction was brought down specifically alleging that 
monies were received as a quid pro quo for noncooperation in 
the main Whitewater matter does not compel a conclusion 
that the tax evasion and asset concealment charges are not 
related to the original subject matter. It would, in my view, 
be unreasonable to require the Independent Counsel to bring 
authorized prosecutions in any special order or sequence 
provided that they are undertaken and continued only so long 
as the "relatedness" requirement remains satisfied. I believe 
such a standard may be inferable from the panel opinion, 
Panel Op. at 18, but I wish to make clear here my own view 
that at the point that the Independent Counsel is no longer 
diligently pursuing his investigation of the main allegation 
that money was channeled to Hubbell for noncooperation or 
misleading testimony, with a reasonable expectation that it 
will prove fruitful, the other ancillary claims of manipulation 
or failure to report taxes cease to be "demonstrably related" 
to the original mandate. It is not enough that the Indepen-
dent Counsel could at one time state a reasonable belief that 


the underlying obstruction allegations were true. In my 
view, the underlying investigation into the hush money charge 
must have been ongoing, and there must have been credible 
evidence that the underlying offense did indeed occur at the 
time the ancillary indictment was filed. To the extent that 
prosecution for the obstruction offense was not practicable at 
the time of the tax indictments, whether because the main 
investigation had yet to be completed, or because the Inde-
pendent Counsel believed that evidentiary problems limited 
the prospects of obtaining a conviction on the obstruction 
offense at that moment, the Independent Counsel would still 
have jurisdiction over the ancillary charges, provided that 
credible evidence remained to substantiate its belief that the 
obstruction crime had been committed. However, if at some 
point during the investigation it becomes apparent that this 
belief is unfounded, then at that time the ancillary counts 
should be passed over to the Justice Department to screen 
and, if appropriate, to prosecute. That does not, however, 
appear to be the case here--we were assured at oral argu-
ment by the Independent Counsel himself that the main hush 
money investigation was not closed, and if there is any reason 
to believe that it is a dead letter at the time the indictment 
for ancillary tax matters was brought (or even when it is 
reinstated on remand here), then a hearing (in camera if 
necessary) by the district judge on the issue would be appro-
priate. But assuming, as we must on the record before us, 
that the principal investigation into possible obstruction was 
alive at the time the ancillary tax indictments were brought 
and remains so, I cannot but conclude that the tax indict-
ments were related to the main endeavor for the reasons set 
out in the panel opinion.1 Panel Op. at 15-18.

__________
 1 Although the dissent challenges the notion that these tax eva-
sion indictments would have been proper even if there had been a 
simultaneous prosecution for taking hush money, but see Oral Arg. 
Tr. at 41, 43-44 (defense counsel endorsing simultaneous prosecu-
tion), I do not see how that argument can be maintained. The 
original mandate, as required by 28 U.S.C. s 593(b)(3), granted the 
Independent Counsel jurisdiction to investigate and prosecute ob-
struction of its primary investigation. When inquiring into whether 


 Finally, while I do believe that some deference is due the 
Special Division's interpretation of these prosecutions as re-
lated to the original one, I would not find it necessary under 
the facts here to decide if the appropriate level of deference is 
substantial, Panel Op. at 7, or only due deference. I do not 
find the agency analogy particularly persuasive, but on the 
other hand I believe that the responsibilities of the Special 
Division under the statute to define the Independent Coun-
sel's jurisdiction initially, and subsequently to assess requests 
for the referral of related matters, strongly militate toward 
some deference; the degree of deference due will likely 
depend on the circumstances of each case. The extent of that 
deference might shift according to whether the Special Divi-
sion's relatedness determination is grounded particularly on 
facts made known to it by the Independent Counsel or the 
Attorney General or on a legal or conceptual conclusion that 
the offenses or persons are sufficiently related to the original 

__________
Hubbell had received hush money in return for noncooperation, the 
Independent Counsel had jurisdiction to investigate the likely con-
cealment of any such payments. As tax evasion constitutes a logical 
part of any effort to evade the detection of illicit funds, the 
Independent Counsel legitimately focused his attention in that 
direction. Whatever Hubbell's subjective motivation for not report-
ing income might have been, tax evasion is an inherently concealing 
activity. To the extent that Hubbell failed to report consulting fees 
alleged to be hush money, he obstructed the obstruction investiga-
tion. Provided that the underlying investigation was still actively 
being pursued, the Independent Counsel accordingly had jurisdic-
tion to investigate and prosecute Hubbell's acts of concealment.

 The dissent suggests, however, that this court, in order to assure 
that the Independent Counsel's investigation had actually unearthed 
evidence of obstruction, should have taken up the Independent 
Counsel's proffer to view evidence relating to the "hush money" 
allegations in camera. Diss. Op. at 17. Aside from the fact that 
one of the defense counsel explicitly denounced such a course at 
oral argument, see Oral Arg. Tr. at 41, that inquiry would be more 
appropriately conducted by the district court when adjudicating a 
motion to dismiss the indictment for unrelatedness on this ground.


mandate. At any rate, I think the relatedness requirement is 
satisfied here under either standard of deference.

 Tatel, Circuit Judge, dissenting from Part I:

 This court today concludes that the indictment of Webster 
Hubbell for failing to pay taxes on income earned in Washing-
ton, D.C., in 1994 "arises out of" or "relates to" the Indepen-
dent Counsel's investigation of various Arkansas land transac-
tions in the mid-1980s known as Whitewater. Because this 
result expands independent counsel authority at the expense 
of the Executive Branch, I believe it violates the constitution-
al principle of separation of powers. By deferring to the 
Special Division and by adopting virtually limitless theories of 
"relatedness," the court fails to police the boundaries that 
Morrison v. Olson deemed essential to the constitutionality of 
the independent counsel statute. See 487 U.S. 654 (1988). 
Mindful of these boundaries, which guarantee political ac-
countability for the prosecutorial function, and of "the duty of 
federal courts to construe a statute in order to save it from 
constitutional infirmities," id. at 682, I would find that the tax 
indictment is not "demonstrably related to the factual circum-
stances that gave rise to the Attorney General's ... request 
for the appointment of the independent counsel," id. at 679. 
I would therefore affirm the district court's order quashing 
the indictment.

 I

 Vesting the executive power in the President of the United 
States, the Constitution directs that "he shall take Care that 
the Laws be faithfully executed." U.S. Const. art. II, s 3. 
To aid in this task, Congress specifically delegated to the 
Attorney General and her subordinates in the Department of 
Justice the power to "conduct any kind of legal proceeding, 
civil or criminal," 28 U.S.C. s 515(a) (1994); see id. s 516, 
including the prosecution of tax crimes, see 28 C.F.R. s 0.70 
(1998).

 The Ethics in Government Act of 1978 carved a narrow 
exception to the Attorney General's power to enforce federal 
criminal law. In the wake of the "extraordinary sequence of 
events" of the Watergate scandal--in particular, the firing of 
special prosecutor Archibald Cox--Congress saw the need for 


"the appointment of an independent temporary special prose-
cutor for certain limited cases where the Department of 
Justice may have a conflict or interest with respect to a 
particular investigation." S. Rep. No. 95-170, at 6, 34 (1977), 
reprinted in 1978 U.S.C.C.A.N. 4126, 4222, 4250. Aware of 
the constitutional implications of creating an independent 
prosecutorial function outside the Executive Branch, Con-
gress adopted an elaborate array of procedures controlling 
the appointment, powers, and jurisdiction of independent 
counsel. See 28 U.S.C. ss 592-596. Independent counsel 
may be removed by the Attorney General for "good cause," 
may perform only certain limited duties, and may act only 
within the scope of prosecutorial jurisdiction ceded by the 
Attorney General. See S. Rep. No. 95-170, at 56, 1978 
U.S.C.C.A.N. at 4272 ("The prosecutorial jurisdiction of the 
special prosecutor is one of the most important devices for 
the control ... and the accountability of such a special 
prosecutor."). Absent expansion by the Attorney General 
under 28 U.S.C. s 593(c), the jurisdiction of an independent 
counsel is limited to matters related to the Attorney General's 
original request for appointment of an independent counsel 
under 28 U.S.C. s 592(d).

 In Morrison, the Supreme Court found these constraints 
essential to the statute's constitutionality. Without them, the 
Court could not have characterized the independent counsel 
as an "inferior officer" under the Appointments Clause of the 
Constitution. See 487 U.S. at 670-77. Once an independent 
counsel investigates or prosecutes matters beyond the juris-
diction ceded by the Attorney General, the independent coun-
sel sheds his "inferior" status and becomes a "principal 
officer" requiring Presidential appointment and Senate confir-
mation. See Buckley v. Valeo, 424 U.S. 1, 132 (1976) (per 
curiam). Although "the power to appoint inferior officers 
such as independent counsel is not in itself an 'executive' 
function in the constitutional sense," Morrison, 487 U.S. at 
695, the power to appoint principal officers surely is. See 
U.S. Const. art. II, s 2, cl. 2. For that reason, the Morrison 
Court thought it constitutionally important that "the jurisdic-
tion of the independent counsel is defined with reference to 


the facts submitted by the Attorney General" and that "the 
Act [28 U.S.C. s 594(f)] requires that the counsel abide by 
Justice Department policy unless it is not 'possible' to do so." 
487 U.S. at 696 (emphasis added). These limitations, among 
others, "give the Executive Branch sufficient control over the 
independent counsel," id., and ensure that the Act does not 
" 'impermissibly undermine[ ]' the powers of the Executive 
Branch," id. at 695 (citation omitted). An independent coun-
sel who exceeds the jurisdiction conferred by the Attorney 
General usurps the President's constitutional power to main-
tain control of the inherently "executive" function of law 
enforcement. See id. at 691, 694.

 Morrison expressed similar constitutional concerns about 
the role of the Special Division of this court. The statute 
allows the Special Division to appoint an independent counsel 
only after the Attorney General makes a preliminary investi-
gation, determines that further investigation is warranted, 
prescribes a subject matter for investigation and potential 
prosecution, and "applies" to the Special Division for an 
appointment. See 28 U.S.C. ss 592(c)-(d), 593(b). In defin-
ing an independent counsel's prosecutorial jurisdiction, the 
Special Division has only one function:

 [to] assure that the independent counsel has adequate 
 authority to fully investigate and prosecute the subject 
 matter with respect to which the Attorney General has 
 requested the appointment of the independent counsel, 
 and all matters related to that subject matter. Such 
 jurisdiction shall also include the authority to investigate 
 and prosecute Federal crimes ... that may arise out of 
 the investigation or prosecution of the matter with re-
 spect to which the Attorney General's request was made, 
 including perjury, obstruction of justice, destruction of 
 evidence, and intimidation of witnesses.

Id. s 593(b)(3). Describing the Special Division's power to 
define jurisdiction as "incidental" to its power to appoint, 
Morrison made clear that the Special Division's authority is 
quite limited:


 [Congress] may vest the power to define the scope of the 
 office in the [Special Division] as an incident to the 
 appointment of the officer pursuant to the Appointments 
 Clause. That said, we do not think that Congress may 
 give the Division unlimited discretion to determine the 
 independent counsel's jurisdiction. In order for the Divi-
 sion's definition of the counsel's jurisdiction to be truly 
 "incidental" to its power to appoint, the jurisdiction that 
 the court decides upon must be demonstrably related to 
 the factual circumstances that gave rise to the Attorney 
 General's investigation and request for the appointment 
 of the independent counsel in the particular case.

487 U.S. at 679 (second emphasis added). To be sure, the 
statute also provides that the Special Division may, upon a 
request by an independent counsel, "refer to the independent 
counsel matters related to the independent counsel's prosecu-
torial jurisdiction." 28 U.S.C. s 594(e). But Morrison left 
no doubt that referrals may not expand the original scope of 
an independent counsel's jurisdiction. See 487 U.S. at 680 
n.18. Consistent with the separation of powers principle, only 
the Attorney General may expand an independent counsel's 
prosecutorial jurisdiction. See 28 U.S.C. s 593(c).

 Thus, the Attorney General's "initial suggestion of jurisdic-
tion," Majority Opinion ("Maj. Op.") at 8--or more precisely, 
as Morrison put it, "the factual circumstances that gave rise 
to the Attorney General's investigation and request for the 
appointment of the independent counsel," 487 U.S. at 679--
serves as the ultimate baseline for assessing the legality of 
any definition of jurisdiction by the Special Division as well as 
any exercise of authority by an independent counsel. Consti-
tutionally required, this baseline reconciles the principle of 
separation of powers with the vesting of prosecutorial author-
ity in an official independent of the Executive Branch. See 
id.

 II

 In her June 30, 1994 application to the Special Division, the 
Attorney General prescribed the subject matter of the Inde-
pendent Counsel's jurisdiction as follows:

 whether any individuals or entities have committed a 
 violation of any federal criminal law, ... relating in any 
 way to James B. McDougal's, President William Jeffer-
 son Clinton's, or Mrs. Hillary Rodham Clinton's relation-
 ships with Madison Guaranty Savings & Loan Associa-
 tion, Whitewater Development Corporation, or Capital 
 Management Services, Inc.

Application for Appointment of Independent Counsel, In re 
Madison Guar. Sav. & Loan Ass'n (June 30, 1994). The 
application also authorized prosecution of any conduct ob-
structing the investigation of this core subject matter. See 
id. Exercising its power under 28 U.S.C. s 593(b)(1), the 
Special Division on August 1, 1994 appointed Kenneth W. 
Starr as independent counsel and granted him prosecutorial 
jurisdiction over matters set forth in the Attorney General's 
application. See Maj. Op. at 3-4 (describing the Special 
Division's original grant of jurisdiction). Responding to sub-
sequent requests from the Independent Counsel, the Special 
Division twice exercised its referral power under 28 U.S.C. 
s 594(e). See Maj. Op. at 4-5 (describing the September 1, 
1994 and January 6, 1998 referrals).

 The second referral arose from an application in which the 
Independent Counsel stated:

 In the course of its investigation, this Office received 
 information regarding payments to Mr. Hubbell from 
 individuals and entities associated with the Clinton Ad-
 ministration. These payments were made starting in 
 1994, when Mr. Hubbell was publicly known to be under 
 criminal investigation. This Office initiated a prelimi-
 nary investigation into whether these payments might be 
 related to Mr. Hubbell's unwillingness to cooperate fully 
 with the investigation, as his plea agreement obligated 
 him to do. The grand jury has heard evidence related to 
 the payments, including evidence that Mr. Hubbell may 
 have committed fraud and tax crimes in connection with 
 them.

Application for Order of Referral, In re Madison Guar. Sav. 
& Loan Ass'n (Dec. 31, 1997), at 3-4. In response, the 


Special Division's referral authorized investigation and prose-
cution of crimes, including tax offenses, associated with Hub-
bell's income since 1994, as well as other crimes such as 
obstruction of justice and perjury "related to payments that 
Mr. Hubbell has received from various individuals and enti-
ties" since 1994. Order Granting Application for Order of 
Referral, In re Madison Guar. Sav. & Loan Ass'n (Spec. Div. 
D.C. Cir. Jan. 6, 1998). The Independent Counsel then 
brought a 10-count, 42-page indictment detailing an elabo-
rate tax evasion scheme allegedly undertaken by Hubbell and 
his wife, along with their lawyer and accountant.

 We now face the following question: Under sections 
593(b)(3) and 594(e) of the Ethics in Government Act, does 
this indictment "arise out of" or "relate[ ] to" the original 
scope of the Independent Counsel's prosecutorial jurisdiction? 
To answer this question, we must evaluate the indictment not 
against the two referrals by the Special Division--those refer-
rals could not have expanded the original scope of the Inde-
pendent Counsel's jurisdiction, see Morrison, 487 U.S. at 680 
n.18--but against the Special Division's original August 5, 
1994 grant of authority. Given Morrison's constitutional 
limitation on the Special Division's power to define indepen-
dent counsel jurisdiction, see id. at 679, the precise question 
before us is this: Is the indictment of Hubbell for tax evasion 
"demonstrably related to the factual circumstances that gave 
rise to the Attorney General's investigation and request for 
the appointment of the independent counsel"?

 Before addressing this issue, this court holds that the 
Special Division's January 1998 referral is entitled to defer-
ence--"substantial" deference, according to Judge Williams; 
at least "due" deference, according to Judge Wald. Either 
way, I disagree.

 At the outset, I think it important to clarify that, as a 
procedural matter, we are not directly reviewing the Special 
Division's referral. The statute nowhere authorizes appeals 
from Special Division referrals. Courts of appeals and the 
Special Division play different institutional roles under the 
independent counsel statute. They act at different stages of 


the investigation, and they have different documents before 
them. Although the Special Division made an implicit deter-
mination of "relatedness" in its referral, it did so in the 
context of a request for investigative and prosecutorial au-
thority. That investigation has now progressed beyond mere 
allegations and has evolved into an indictment. Our task, like 
the district court's before us, is to resolve a specific dispute 
whose parameters have crystallized: We must decide whether 
the April 30, 1998 indictment, in all its concreteness and 
particularity, is "related to" the original scope of the Indepen-
dent Counsel's prosecutorial jurisdiction. The Special Divi-
sion did not resolve this question, nor could it.

 In support of giving the referral deference, Judge Williams 
accepts the view that the Special Division "act[ed] quite like 
[an agency] glossing its own regulation" when it exercised its 
referral power. Maj. Op. at 8. However, the Special Divi-
sion possesses none of the characteristics of agencies that 
entitle their legal judgments to judicial deference. See Chev-
ron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 
467 U.S. 837, 865 (1984). In making "related to" determina-
tions, the Special Division exercises no special or technical 
expertise that circuit and district courts lack. The Special 
Division has no political accountability through either execu-
tive or congressional oversight, and its members are neither 
appointed by the President nor confirmed by the Senate for 
their role. No provision of law allows for direct judicial 
review of its decisions. Unlike administrative agencies--and 
unlike even the U.S. Sentencing Commission, see 28 U.S.C. 
ss 991(b), 994-995--the Special Division exercises no 
congressionally-delegated policymaking responsibilities. This 
last fact alone undermines the agency analogy, for "the power 
authoritatively to interpret its own regulations is a component 
of the agency's delegated lawmaking powers." Martin v. 
Occupational Safety & Health Review Comm'n, 499 U.S. 144, 
151 (1991) (emphasis added), quoted in Maj. Op. at 9.

 Morrison left no doubt that in both form and function, the 
Special Division is a court, not an agency. The opinion 
consistently refers to the Special Division as a "court": "The 
court consists of three circuit court judges or justices appoint-


ed by the Chief Justice of the United States," 487 U.S. at 661 
n.3; "we do not think it impermissible for Congress to vest 
the power to appoint independent counsel in a specially 
created federal court," id. at 676; "there is no risk of partisan 
or biased adjudication of claims regarding the independent 
counsel by that court," id. at 683; "once the court has 
appointed a counsel and defined his or her jurisdiction, it has 
no power to supervise or control the activities of the counsel," 
id. at 695. Were this language not clear enough, Morrison 
explicitly held that the Special Division's functions fall within 
the range of powers assigned to federal courts by the Ap-
pointments Clause, see id. at 673-77, and by Article III, see 
id. at 677-85.

 Morrison also acknowledged that the Special Division func-
tions in a judicial capacity when exercising its referral power. 
Observing that "in order to decide whether to refer a matter 
to the counsel, the court must be able to determine whether 
the matter falls within the scope of the original grant," the 
Supreme Court said that the referral power involves "the 
power to 'reinterpret' or clarify the original grant." Id. at 
685 n.22 (emphasis added); see also In re Espy, 80 F.3d 501, 
507 (Spec. Div. D.C. Cir. 1996) ("In referring a related 
matter, this court is interpreting, but not expanding, the 
independent counsel's original prosecutorial jurisdic-
tion...."). In other words, the referral function requires the 
Special Division to decide a legal question--i.e., whether the 
matters contained in an independent counsel's request for 
referral are "related to" the original jurisdictional grant. See 
id. at 507-09; In re Olson, 818 F.2d 34, 47-48 (Spec. Div. 
D.C. Cir. 1987). Answering this question calls on the Special 
Division--whether explicitly (as in Espy) or implicitly (as in 
this case)--to develop and apply a theory of "relatedness" 
consistent with the independent counsel statute and the Con-
stitution.

 Because the Special Division's January 1998 "related to" 
determination amounts to a legal judgment, we owe it no 
deference. We typically apply de novo review to decisions of 
other courts (except the Supreme Court) on questions of 
federal law, see Elder v. Holloway, 510 U.S. 510, 516 (1994) 


(questions of law must be resolved de novo on appeal), and 
"[w]hen de novo review is compelled, no form of appellate 
deference is acceptable," Salve Regina College v. Russell, 499 
U.S. 225, 238 (1991). No one contends that the Special 
Division, as part of the D.C. Circuit, creates binding circuit 
precedent through its decisions. In relation to this court, the 
Special Division's legal determinations resemble those of our 
sister circuits, whose conclusions of law we review neither 
directly nor deferentially.

 Acknowledging that referrals could be characterized as 
judicial acts, Judge Williams says that referrals most closely 
resemble the issuance of search warrants by federal magis-
trates or state judges, whose determinations of probable 
cause, "[a]lthough made ex parte and resolving constitutional 
questions," are accorded " 'great deference' " under settled 
law. Maj. Op. at 11 (citing Illinois v. Gates, 462 U.S. 213, 236 
(1983)). In Gates, however, the Supreme Court made clear 
that the deferential standard of appellate review applicable to 
search warrants stems directly from the intensely fact-bound 
nature of an issuing magistrate's probable-cause determina-
tion. See 462 U.S. at 232 ("[P]robable cause is a fluid 
concept--turning on the assessment of probabilities in partic-
ular factual contexts--not readily, or even usefully, reduced 
to a neat set of legal rules."); id. at 241 ("[P]robable cause 
deals 'with probabilities. These are not technical; they are 
the factual and practical considerations of everyday life on 
which reasonable and prudent men, not legal technicians, 
act.' ") (citation omitted). Unlike a magistrate, the Special 
Division does not "make a practical, common-sense decision" 
about probabilities when it considers requests for referrals. 
Id. at 238. Rather, it compares two legal documents--the 
independent counsel's referral request and the original grant 
of prosecutorial jurisdiction--and then determines whether 
the former is "related to" the latter within the meaning of the 
statute. Like a court evaluating a complaint on a motion to 
dismiss, the Special Division finds no facts, weighs no evi-
dence, and makes no credibility determinations. It simply 
decides a question of law. Given the interpretive nature of 
this task, deference cannot be justified on the grounds "that 


the [Special Division] is 'better positioned' than the appellate 
court to decide the issue in question or that probing appellate 
scrutiny will not contribute to the clarity of legal doctrine." 
Salve Regina College, 499 U.S. at 233.

 It is true that a referral under the independent counsel 
statute presents a situation "[w]here ... the relevant legal 
principle can be given meaning only through its application to 
the particular circumstances of a case." Miller v. Fenton, 
474 U.S. 104, 114 (1985). But the Supreme Court has direct-
ed that in such situations a federal appellate court must 
retain "its primary function as an expositor of law." Id. De 
novo appellate review is particularly important where, as 
here, the relevant legal principle has constitutional dimen-
sions. See, e.g., Thompson v. Keohane, 516 U.S. 99, 107 
(1995) (requiring federal habeas court to review de novo 
whether suspect was "in custody" at time of interrogation for 
purposes of Miranda); Miller, 474 U.S. at 112 (requiring 
"independent federal determination" of the voluntariness of a 
confession).

 I disagree that referrals will have no real function under 
the statute unless we defer to the Special Division. See Maj. 
Op. at 11. For one thing, the Special Division's referral 
authority provides independent counsel, sensitive to both the 
limitations on their office and the ethic of self-restraint hon-
ored by federal prosecutors, with an avenue for seeking 
independent and impartial confirmation of their authority. 
Immune from direct judicial review, a referral gives legitima-
cy to an independent counsel's investigation even if a federal 
court later determines that a specific indictment exceeds the 
prosecutor's jurisdiction. This legitimacy provides a level of 
protection against any attempt by the Attorney General to 
remove or by Congress to impeach an independent counsel on 
the grounds that he has overstepped his authority. See 28 
U.S.C. s 596(a)(1). The referral process also empowers the 
Special Division to enforce the boundaries of independent 
counsel jurisdiction. Where the Special Division rejects a 
request for referral, only the most zealous and imprudent 
prosecutor would pursue matters covered by the rejected 
application. Far from existing "simply to relieve the solitude 


of the Independent Counsel's office," Maj. Op. at 11, the 
referral power thus serves important functions under the 
statutory scheme, constraining independent counsel when 
they near the limit of their authority and safeguarding their 
political independence if their investigative authority is chal-
lenged.

 For all of these reasons, I would hold that this court owes 
no deference to the Special Division's "related to" determina-
tion. In assessing the legality of this tax indictment, our 
review should be de novo.

 III

 This court's conclusion that the Independent Counsel has 
authority to proceed with this indictment stems from its view, 
flawed in my judgment, that we would "undercut [Morrison]" 
were we to construe the independent counsel statute in ways 
"that prevent this Independent Counsel from performing his 
duty in a manner reasonably approximating that of an ordi-
nary prosecutor." Maj. Op. at 20. Insisting on affording the 
Independent Counsel the same "leeway," id. at 15, given to 
"every other prosecutor," id. at 19, the court ignores the basic 
premise critical to the constitutionality of the statute: Inde-
pendent counsel do not and cannot have the powers of 
ordinary prosecutors. If they did, the office would " 'imper-
missibly undermine[ ]' the powers of the Executive Branch." 
Morrison, 487 U.S. at 695 (citation omitted). Among other 
constraints, it is the limited jurisdiction of independent coun-
sel that "give[s] the Executive Branch sufficient control over 
the independent counsel to ensure that the President is able 
to perform his constitutionally assigned duties." Id. at 696. 
That an ordinary federal prosecutor might have authority to 
indict Hubbell for tax evasion therefore tells us nothing about 
whether this Independent Counsel--constrained by the stat-
ute and the separation of powers principle--may bring the 
same indictment. Nor do we learn anything from the author-
ity possessed by the Watergate Special Prosecutor, see Maj. 
Op. at 17, for the full scope of his authority flowed directly 


from the Attorney General, thus presenting no separation of 
powers concerns.

 Reviewing the record de novo, I would find that the indict-
ment of Hubbell for tax evasion was not "demonstrably 
related to the factual circumstances that gave rise to the 
Attorney General's investigation and request for the appoint-
ment of the independent counsel." Morrison, 487 U.S. at 
679. Hubbell's alleged failure to pay taxes on fees for work 
from 1994 to 1997 in Washington, D.C., is unrelated to 
whether, almost a decade earlier in Little Rock, Arkansas, 
"any individuals or entities have committed a violation of any 
federal criminal law ... relating in any way to James B. 
McDougal's, President William Jefferson Clinton's, or Mrs. 
Hillary Rodham Clinton's relationship with Madison Guaranty 
Savings and Loan Association, Whitewater Development Cor-
poration, or Capital Management Services, Inc." Application 
for Appointment of Independent Counsel. The Attorney 
General who prescribed the original subject matter for inves-
tigation agrees. According to her amicus brief:

 [A]n offense cannot be 'related' within the meaning of 
 [the statute] solely because an independent counsel dis-
 covers it during a legitimate phase of his investigation. 
 That interpretation of the statute would allow an inde-
 pendent counsel to prosecute offenses that bear no rela-
 tionship to his original grant of jurisdiction.

Amicus Br. for United States at 32. "The current prosecu-
tion," the Attorney General concludes, "does not fall within 
[the Independent Counsel's] authority directly to investigate 
the Whitewater/Madison Guaranty matter." Id. at 34.

 In reaching the opposite conclusion, this court rests its 
finding of "relatedness" on two assumptions: that the fees 
Hubbell received were payments for his silence, and that his 
failure to pay taxes on them had an obstructive effect on the 
Whitewater investigation. In my view, both assumptions are 
flawed, and each independently undermines the statutory and 
constitutional constraints on independent counsel jurisdiction.


 Assumption of obstructive effect

 I begin with the court's second assumption, i.e., that Hub-
bell's failure to pay taxes on alleged hush money had an 
obstructive effect on the Whitewater investigation. Not limit-
ed to Hubbell's failure to pay taxes on alleged hush money, 
the indictment's sheer breadth belies the court's obstruction 
theory. The indictment charges Hubbell with non-payment 
of taxes on income from a book contract with HarpersCollins 
Publishers, early withdrawals from an IRA account and pen-
sion plan, and sales of his home and a Little Rock warehouse. 
In addition, by charging Hubbell's lawyer and accountant for 
aiding and abetting tax evasion, the Independent Counsel did 
not limit the indictment to individuals who could have ob-
structed the Whitewater investigation.

 According to my colleagues, "any criminal conduct that 
could hide the hush money ... tends to impede investigation 
and prosecution of the matter being hushed up." Maj. Op. at 
16. "The less disclosure of the payments," they say, "the less 
chance that they and their nature will come to light...." Id. 
But even assuming that Hubbell's "consulting" fees were 
hush money (an assumption not supported by this record, see 
infra at 16-17), the facts of this case provide no support for 
the court's concealment theory. In his 1994 tax return, 
Hubbell actually disclosed $376,075 in "consulting" income 
that the Independent Counsel suspects is hush money. This 
amount included $100,000 from Hong Kong China Limited 
and $62,775 from Revlon, the two sources the court high-
lights, see Maj. Op. at 4-5 & n.1, en route to finding that 
"[t]he timing, sources, and extent of the payments make the 
belief that they were hush money reasonable," id. at 20. 
Acknowledging these disclosures, the court rests its finding of 
concealment on the fact that Hubbell did not report an 
additional $77,000 in "consulting" fees in 1994. See Maj. Op. 
at 16. But since Hubbell disclosed the lion's share of the 
alleged hush money on his 1994 tax return--including the 
very payments that the Independent Counsel and my col-
leagues believe have the strongest whiff of obstruction--it 
seems odd to think that Hubbell chose not to disclose the 
remaining fraction in order to conceal hush money payments. 


In any case, nothing in the record (beyond the non-disclosure 
itself) suggests that the $77,000 was hush money. See infra 
at 16-17. We thus lack any basis for suspecting that Hub-
bell's non-disclosure reflected a concerted effort to hide hush 
money instead of a tendency (generally apparent from the 
indictment) to ignore the internal revenue laws.

 The court's concealment theory makes much more sense in 
a case like United States v. Haldeman, 559 F.2d 31 (D.C. Cir. 
1976), cited in Maj. Op. 17. There the defendants directly 
obstructed the Watergate investigation by lying under oath to 
the Special Prosecutor, a grand jury, and a Senate committee 
about hush money payments they had made to the Watergate 
burglars. See 559 F.2d at 59; see also United States v. 
Blackley, No. 98-3036, slip op. at 9 (D.C. Cir. Jan. 26, 1999) 
(upholding conviction of high-ranking Department of Agricul-
ture official who concealed payments he received from indi-
viduals regulated by the Department by failing to disclose 
those payments on an official financial disclosure form whose 
very purpose was "to bring suspicious influences to the 
surface").

 The court next adopts the Independent Counsel's argument 
that Hubbell's failure to pay taxes "enhanc[ed] the financial 
or economic effect of the hush money payments.... And 
that contributes to the obstruction of the investigation." Oral 
Arg. Tr. at 16; see Maj. Op. at 16 ("[T]he more value Hubbell 
can squeeze from hush money ... , the more chance it will 
succeed in preventing his cooperation."). But even if we 
again assume the payments to be hush money, their obstruc-
tive effect ended upon Hubbell's receipt; his subsequent non-
payment of taxes bought his benefactors no further silence. 
The Independent Counsel never alleged that Hubbell's bene-
factors somehow discounted the value of the alleged hush 
money by the probability that he would not pay taxes. In-
deed, who could have foreseen the bizarre nature of the tax 
evasion scheme detailed in the indictment? Who would have 
expected that, having reported $376,075 of his $450,010 in 
"consulting" income on his 1994 tax return, Hubbell would 
then, as with his other income, not pay taxes on it?


 The court's economic enhancement theory permits virtually 
unlimited expansion of the Independent Counsel's jurisdic-
tion. Had Hubbell used the alleged hush money for profit-
able but illegal gambling or insider trading, for example, this 
theory would allow the Independent Counsel to indict him for 
these crimes simply because they increased the value of the 
money. Surely this result stretches the concept of "related-
ness" beyond its statutory and constitutional breaking point.

 Together, the concealment and economic enhancement the-
ories enable the Independent Counsel to comb through all of 
Hubbell's investments and expenditures--including, as the 
indictment reveals, his purchase of clothes, groceries, and 
laundry services--until discovering some illegality on which 
to indict him. By adopting these theories, the court converts 
the Office of the Independent Counsel from a device for 
investigating a specific "subject matter," 28 U.S.C. 
s 593(b)(3), into a tool for prosecuting a specific individual. 
As the district court observed, "[t]he Madison-Whitewater 
matters that were the subject of the Original Grant and the 
tax matters that are the subject of this case have nothing in 
common--nothing, at least, that appears on this record--
except Webster Hubbell." United States v. Hubbell, 11 
F. Supp. 2d 25, 32 (D.D.C. 1998). This is precisely the result 
Justice Scalia, dissenting in Morrison, most feared:

 [T]he most dangerous power of the prosecutor [is] that 
 he will pick people that he thinks he should get, rather 
 than cases that need to be prosecuted. With the law 
 books filled with a great assortment of crimes, a prosecu-
 tor stands a fair chance of finding at least a technical 
 violation of some act on the part of almost anyone. In 
 such a case, it is not a question of discovering the 
 commission of a crime and then looking for the man who 
 has committed it, it is a question of picking the man and 
 then searching the law books, or putting investigators to 
 work, to pin some offense on him.

487 U.S. at 728 (Scalia, J., dissenting) (quoting then-Attorney 
General Robert Jackson, The Federal Prosecutor, Address 


Delivered at the Second Annual Conference of United States 
Attorneys (April 1, 1940)).

 Deeply corrosive to the statutory and constitutional limits 
on independent counsel jurisdiction, the court's concealment 
and economic enhancement theories cannot justify a finding 
of "relatedness" in this case. In my view, this conclusion in 
and of itself is enough to sustain the district court's quashing 
of the indictment. But because the court's contrary holding 
also rests on the assumption that Hubbell's fees were hush 
money, I set forth my views on this issue as well.

 Assumption that Hubbell's fees were hush money

 Even if the court's concealment and economic enhancement 
theories had merit, they have no applicability to this case for 
one simple reason: Although both depend entirely upon 
Hubbell's involvement in an underlying crime of obstruction, 
this record contains no credible evidence of such a crime.

 In his brief, the Independent Counsel refers to the "possi-
bility" that Hubbell "might have accepted money as an in-
ducement to obstruct the Madison investigation." OIC Br. at 
20 (emphasis added); see also id. (stating that "large pay-
ments" on which Hubbell did not pay taxes "may be related 
to his non-cooperation with respect to Whitewater and 
Madison-related matters") (emphasis added). Yet the Inde-
pendent Counsel has chosen not to indict Hubbell for accept-
ing hush money payments or anyone else for making them. 
Although I agree with my colleagues that the Independent 
Counsel need not formally charge Hubbell for accepting hush 
money in order to indict him for tax evasion, I disagree that 
we may sustain the tax indictment simply because the Inde-
pendent Counsel is "diligently pursuing his investigation of 
the main allegation that [hush] money was channeled to 
Hubbell," Wald Op. at 1. Without credible evidence that 
Hubbell accepted hush money, there can be no "demon-
strabl[e] relat[ionship]" between Hubbell's tax crimes and the 
Independent Counsel's original grant of jurisdiction. Morri-
son, 487 U.S. at 679 (emphasis added).

 At oral argument, the Independent Counsel conceded that 
"we right now, as a matter of public record, don't know" that 

Hubbell's "consulting" income was hush money. Oral Arg. 
Tr. at 13. Notwithstanding this uncertainty, my colleagues 
have seen no need either to accept the Independent Counsel's 
offer to submit evidence in camera--evidence that he claims 
shows that the commission of that crime was more likely than 
not, see id.--or to remand to the district court to consider 
such evidence. Instead, they accede to his request that we 
not "indulge in the assumption that there is no evidence of 
obstruction," id., shoring up the Independent Counsel's innu-
endo with non-record evidence plus a little innuendo of their 
own, see Maj. Op. at 4-5 n.1.

 The record in this case is quite unlike the record in United 
States v. Haldeman, where this court upheld the convictions 
of H.R. Haldeman, John Ehrlichman, and John Mitchell for 
"conceal[ing] a cover-up" in the Watergate affair. Maj. Op. 
at 17 (emphasis omitted). In that case, the allegations that 
the defendants paid hush money to the Watergate burglars 
and then lied about it under oath were supported by vast 
amounts of credible evidence, primarily consisting of direct 
testimony and tape recordings of key conversations among 
the co-conspirators. See Haldeman, 559 F.2d at 55-59 (de-
scribing defendants' "commitments" to pay the burglars hush 
money and detailing defendants' extensive conspiracy to raise, 
transfer, deliver, and conceal the hush money payments).

 My colleagues say that independent counsel should enjoy 
the same discretion that U.S. Attorneys have to charge 
defendants with "cover-up" crimes without charging them for 
the underlying crimes. See Maj. Op. at 18 (citing Depart-
ment of Justice guidelines). But as I have pointed out, 
Hubbell's tax offenses cannot plausibly be labeled "cover-up" 
crimes. See supra at 13-14. Moreover, the court's analogy 
is constitutionally flawed. It ignores the critical fact that 
U.S. Attorneys, unlike independent counsel, never need to 
prove that a particular crime falls within the jurisdiction 
ceded to them. They have authority to follow a trail of 
criminality and (subject to Justice Department procedures 
described below) to convert an investigation of real estate 
fraud into a prosecution of tax crimes. If the constitutional 


separation of powers precludes anything, it precludes the 
extension of such vast discretion to independent prosecutors 
who lack "the unifying influence of the Justice Department" 
and "the perspective that multiple responsibilities provide." 
487 U.S. at 732 (Scalia, J., dissenting).

 IV

 Finally, in addition to adopting virtually limitless theories 
of "relatedness" and assuming that Hubbell accepted hush 
money, my colleagues discount the constitutionally significant 
requirement that independent counsel "comply with the writ-
ten or other established policies of the Department of Justice 
respecting enforcement of the criminal laws" unless "to do so 
would be inconsistent with the purposes of the [Act]." 28 
U.S.C. s 594(f)(1); see Morrison, 487 U.S. at 696. Under 
Department of Justice Tax Division Directive 86-59, all feder-
al prosecutors, expressly including independent counsel, must 
follow certain procedures before "seeking to expand nontax 
grand jury investigations to include inquiry into possible 
federal criminal tax violations." Authority to Approve Grand 
Jury Expansion Requests to Include Federal Criminal Tax 
Violations, 5 Dep't of Justice Manual 6-227, 6-227 (1995-1 
Supp.). This directive prevents prosecutors from targeting 
an individual for tax crimes when their investigative authority 
extends only to a non-tax criminal investigation. Specifically, 
it requires all prosecutors to submit written requests to 
officials at the Internal Revenue Service and Tax Division 
"containing pertinent information relating to the alleged fed-
eral tax offenses." Id. at 6-228. Approval requires an IRS 
referral certifying that "there is reason to believe that federal 
criminal tax violations have been committed." Id. at 6-229. 
In addition, prosecutors must conduct grand jury proceedings 
"in sufficient time to allow the results of the tax segment of 
the grand jury proceedings to be evaluated by the Internal 
Revenue Service and the Tax Division before undertaking to 
initiate criminal proceedings." Id.

 In this case, I see no reason why the Independent Counsel 
could not have complied with Tax Directive 86-59. My 


colleagues are willing to assume that requiring such compli-
ance would be "inconsistent with the purposes" of the inde-
pendent counsel statute, 28 U.S.C. s 594(f)(1), attributing to 
the IRS--merely because it is an executive branch agency--a 
conflict of interest so severe that it cannot make a reasoned 
judgment as to whether Hubbell should be prosecuted for tax 
crimes. They apparently view compliance with Justice De-
partment procedures as categorically "inconsistent with the 
purposes" of the statute whenever such procedures submit 
federal prosecutors to oversight by executive branch agencies. 
Surely section 594(f)(1) is not so toothless. This provision, 
which at the time of Morrison required compliance "except 
where not possible," 28 U.S.C. s 594(f) (Supp. V 1983) 
(amended 1994), was viewed by the Supreme Court as one of 
the statutory safeguards ensuring that the Executive Branch 
has enough control over independent counsel to accomplish its 
constitutionally assigned functions. See Morrison, 487 U.S. 
at 696.

 V

 In sum, I believe that the court's finding of "relatedness"--
premised on deference to the Special Division, unbounded 
theories of obstruction of justice, and unsubstantiated suspi-
cions of illegality--undermines the constitutional constraints 
on independent counsel jurisdiction. Morrison endowed the 
statute's jurisdictional controls with constitutional significance 
because it recognized that the absence of such controls would 
enable independent counsel to usurp executive power. This 
case provides reason to worry that the Office of the Indepen-
dent Counsel indeed functions as a "mini-Executive ... oper-
ating in an area where so little is law and so much is 
discretion." Morrison, 487 U.S. at 732 (Scalia, J., dissenting). 
Because the constitutional separation of powers demands 
greater vigilance, I believe that this Independent Counsel has 
exceeded his jurisdiction.

 My conclusion would not impair the Ethics in Government 
Act's "central purpose ... [of] permit[ting] the effective 
investigation and prosecution of high level government and 


campaign officials," United States v. Wilson, 26 F.3d 142, 148 
(D.C. Cir. 1994), quoted in Maj. Op. at 15. This Independent 
Counsel's original grant gives him all the authority he needs 
to prosecute Hubbell and others for obstruction of justice if 
he has evidence that Hubbell received hush money. See 28 
U.S.C. s 593(b)(3). If he wants to prosecute Hubbell for self-
standing tax offenses discovered in the course of his investi-
gation, he can ask the Attorney General to expand his investi-
gative jurisdiction, see id. s 593(c), and then set in motion 
Justice Department procedures for prosecuting criminal tax 
violations, see supra at 18. As the subsequent indictment of 
Hubbell illustrates, see Neil A. Lewis, Starr Indicts Hubbell a 
3d Time, N.Y. Times, Nov. 14, 1998, at A1, the Independent 
Counsel, short of pursuing this tax indictment, retains vast 
investigative and prosecutorial authority under the Special 
Division's January 1998 referral.

 I respectfully dissent.

 Williams, Circuit Judge, dissenting from Part II: The 
commentator who predicted that Fisher and Doe would "inev-
itably lead" to "metaphysical speculation" was apparently all 
too prescient. See Samuel A. Alito, Jr., "Documents and the 
Privilege Against Self-Incrimination," 48 U. Pitt. L. Rev. 27, 
59 (1986). The majority opinion supplies some such specula-
tion and demands more from the district court on remand. I 
would limit the district court's inquiry about the subpoenaed 
documents to verifying that the Independent Counsel, in 
securing Hubbell's indictment, has only used information that 
he would have had if the documents had appeared in his 
office, unsolicited and without explanation.

 * * *

 It is clear that a prosecutor who has obtained personal 
documents by subpoena may not, without violating either the 
Fifth Amendment or a use immunity of equivalent scope 
granted under 28 U.S.C. s 6002, use against the subpoenaed 
person any testimonial, incriminating information that is com-
municated by that person's "act of production" of the docu-
ments. See Doe v. United States, 487 U.S. 201, 209 (1988) 
("Doe II"). The Supreme Court identified three species of 
information possibly communicated by such an act of produc-
tion--possession, authentication and existence. See id.

 Here the only interesting issue is the "existence" theory; 
possession and authentication seem properly outside the case. 
Hubbell's prior possession is irrelevant if, as appears to be 
the case, the Independent Counsel relied on the documents 
only for the information that they contain, and thus had no 
occasion to rely on Hubbell's act of production, or anything 
else, for evidence that Hubbell at one time had "possessed" 
them. Nor does it appear that he used the production for 
authentication; he never sought to show the grand jury that 
Hubbell, by delivering the documents in response to the 
subpoena, had identified them as being ones that matched the 
descriptive language of the subpoena.

 Thus we are left with "existence." From the truism that 
the Independent Counsel could not use the contents of the 


documents unless they (at some time) existed, and unless he 
learned of that existence, the majority leaps to the proposi-
tion that the Independent Counsel's awareness of their exis-
tence stems from a testimonial aspect of Hubbell's act of 
production. Accordingly, it says, the Independent Counsel 
may use the information in the documents if but only if he can 
show that he possessed, before securing the subpoena, a 
knowledge of the documents' existence sufficiently detailed 
that his later knowledge, after their delivery, was a "foregone 
conclusion."

 But not all aspects of the act of production are testimonial. 
Where an item of information that the prosecutor receives 
from a document delivery flows from a non-testimonial as-
pect, he does not depend on any testimonial aspect. Informa-
tion as to the existence of the pieces of paper turned over by 
a subpoenaed party can always be traced to non-testimonial 
information. I elaborate below.

 * * *

 "Testimonial." Before the Fisher Court introduced the 
"foregone conclusion" discussion on which the majority is so 
focused--and which I discuss below--it observed that the 
whole issue of whether something is "testimonial" depends on 
the facts and circumstances. Fisher v. United States, 425 
U.S. 391, 410 (1976). But what facts and circumstances are 
relevant?

 One possibility might be that all actions from which we can 
glean information are considered testimonial communications 
for purposes of Fifth Amendment analysis. But the prece-
dents upon which Fisher relied in more or less rejecting the 
view of Boyd v. United States, 116 U.S. 616 (1886), that the 
Fifth Amendment protects the contents of subpoenaed docu-
ments, appear to rule this out. Those cases involve the 
government forcing a person to try on a blouse worn by the 
perpetrator to establish whether it fit the defendant, Holt v. 
United States, 218 U.S. 245 (1910), or to give blood samples, 
Schmerber v. California, 384 U.S. 757, 764-65 (1966), voice 
samples, United States v. Wade, 388 U.S. 218, 222-23 (1967), 

or handwriting samples, Gilbert v. California, 388 U.S. 263, 
266-67 (1967). They do not rely on anything like the "fore-
gone conclusion" rationale; instead, they find that such acts 
are not testimonial because they fit into the category of 
"compulsion which makes a suspect or accused the source of 
'real or physical evidence.' " Schmerber, 384 U.S. at 764.

 Nor can these cases be recharacterized as ones where the 
prosecutor's grasp of the information obtained was a foregone 
conclusion. Of course it is true that, for example, it is 
typically not much to admit that one can speak. But in giving 
a voice sample, one also admits that one's voice has various 
characteristic idiosyncrasies--a non-obvious and incriminating 
fact that the law allows the prosecutor to secure by compul-
sion. The prosecutor's and jury's access to that information 
is as dependent on the speaker's compelled implicit admission 
of ability to speak as their access to the information on 
documents is dependent on the subpoenaed party's implicit 
admission of the documents' existence.

 One can, of course, discern a communicative element in the 
giving of a voice sample: a person commanded to speak 
implicitly says, "This is the way I sound when I speak." But 
that information adds nothing to what a jury learns from its 
own ears (or from a properly authenticated tape, if that is the 
way it is done, see, e.g., United States v. Dionisio, 410 U.S. 1 
(1973) (grand jury subpoena requiring suspects to read tran-
scripts into a recording device is consistent with Fifth 
Amendment)). Similarly, a person giving a blood sample 
implicitly says, "This is my blood." Though there is implicit 
communication, the prosecutor need not rely on it, so long as 
he has the blood and a witness to the blood-giving itself.

 "Foregone Conclusion." The most confusing part of Fisher 
is the language that the courts have taken to tie "foregone 
conclusion" closely to the "testimonial" analysis and vice 
versa. 425 U.S. at 411. The Court said: "Surely the Govern-
ment is in no way relying on the 'truthtelling' of the taxpayer 
to prove the existence of or his access to the documents. The 
existence and location of the papers are a foregone conclu-
sion...." Id. (citation omitted). In my view, the latter 


sentence should be read in light of the former. That is, 
"foregone conclusion" is only a subset of the broader set: 
instances where sources independent of testimonial aspects of 
the compulsion fully account for the prosecutor's evidence.

 This relationship is illustrated in an example used in Fish-
er: "When an accused is required to submit a handwriting 
exemplar he admits his ability to write and impliedly asserts 
that the exemplar is his writing. But in common experience, 
the first would be a near truism and the latter self-evident." 
Id. The Court here is implicitly referring to Gilbert v. 
California, 388 U.S. at 265-67, one of the cases it had just 
relied upon in more or less overruling Boyd. In Gilbert, the 
police got the suspect to write out some handwriting exem-
plars while he was in custody and being questioned. When 
the Court calls the implicit admission of ability to write a 
"near-truism," the "near" is critical. Consider a kidnapping, 
in which a ransom note is a major piece of evidence, but the 
suspect claims illiteracy. Suppose police, posing as terrorists, 
frightened him into writing something (the text of which had 
no bearing on the kidnapping). There might be some sort of 
due process argument, but in using the handwriting sample 
the prosecutor would not need to rely on any implicit testimo-
nial aspect of the scenario ("Yes, I do know how to write."); 
accordingly he could use the sample without violation of the 
defendant's privilege against self-incrimination.

 More important is the defendant's implicit admission that 
the exemplars are his. This is not, strictly speaking, "self-
evident"; rather, it is supported by evidence (the testimony of 
the witnessing police officers) of a non-testimonial aspect of 
the act of production, here the act of writing. But as the 
Court says, the government is "in no way relying on the 
'truthtelling' of [defendant]" to prove anything: it is relying 
only on the immediate personal observations of the policemen 
and on nontestimonial aspects of the defendant's act to link 
the handwriting to the defendant. Everything else of eviden-
tiary value, namely the idiosyncrasies of the writing, depends 
only on the writing itself. As we'll see more explicitly below, 
this matches the relation of a prosecutor to documents deliv-
ered pursuant to subpoena. The information on the docu-


ments stands or falls on its own value, even though (by 
definition) produced by the defendant's act of production. 
Thus: for handwriting, the link to the defendant is estab-
lished by police witnesses and the testimonial value of the 
defendant's act of production is redundant; for documentary 
information, so long as the prosecutor depends as here only 
on information in the documents themselves for the link to 
defendant, the communicative aspect of the act of delivery is 
equally redundant.

 Existence. In light of the above, the only sense of "exis-
tence" that is covered by the Fifth Amendment is that which 
refers back to the subpoena. The responsiveness of the 
documents to the subpoena gives knowledge of "the existence 
of the papers demanded," 425 U.S. at 410 (emphasis added). 
"Yes, these are the records you described in the subpoena." 
If the government could refer back to the subpoena to 
identify documents and to clarify relationships that were not 
clear on their face or by other independent means, then it 
would be using a testimonial component of the transaction--
the witness's implicit statement that the documents match the 
subpoena's description. Hubbell's claim for blanket exclusion 
of the contents, by contrast, relies on existence in a quite 
different sense--the fact that these particular pieces of paper 
are in being. But this is quite easily confirmed by these 
papers' own physical presence, which is "self-evident" at the 
time and place of production and so long thereafter as the 
government maintains proper custody. Existence in that 
sense is as "self-evident" as the blood and its characteristics 
in Schmerber, the voice samples and their characteristics in 
Wade, and the handwriting and its characteristics in Gilbert.

 Some of the language in Fisher and Doe, to be sure, 
suggests a more sweeping view of "existence." Fisher I have 
discussed above. Doe upholds a decision quashing certain 
subpoenas, based on trial court findings (endorsed by the 
court of appeals) that delivery of the documents gave the 
prosecutor previously absent knowledge of their existence, 
possession, and authenticity. See United States v. Doe, 465 
U.S. 605, 613-14 & nn.11-13 (1984). But the implications are 


quite unclear. The Court relied explicitly and entirely on the 
"two courts" rule. Id. While the majority argues that the 
findings below were structurally applications of law to fact, 
see Maj. at 34-35 n.24, the Court's treatment of them was as 
simple fact. Second, to the extent that its rehearsing of the 
arguments embraced in the courts below may suggest the 
sort of "existence" theory employed by the majority, the 
inference is drawn in question by the Court's reliance on the 
anticipated use of the act of production for authentication of 
the documents, i.e., use of an indisputably testimonial aspect 
of subpoena compliance. See 465 U.S. at 614 n.13.

 Accordingly, the logic of Fisher and Doe, if not every 
phrase, clearly supports the prosecutor's right to use informa-
tion from subpoenaed documents regardless of whether he 
was previously able to describe them. The particular docu-
ments' existence speaks for itself once they have been deliv-
ered; so long as his use of them is independent of any 
testimonial aspects of the witness's act of production, that 
use is consistent with the witness's Fifth Amendment privi-
lege.

 * * *

 The majority confuses the issue with a rather odd distinc-
tion: if compulsion "acts upon, and requires the exercise of an 
individual's mental faculties for communication," it is testimo-
nial; if it "merely utilizes the body of the accused as a form of 
evidence," it is not. Maj. at 39.

 To the extent that the majority here acknowledges that the 
bare physical aspects of a production--the meanings that are 
directly apparent to the senses--are unprotected by the Fifth 
Amendment, it is correct. But there is no reason to restrict 
this to the "body of the accused."

 In fact, the majority fails to explain the cases that fall 
outside this apparent restriction. Gilbert v. California, ap-
provingly cited by the majority, concerned a handwriting 
sample that the suspect had to write out and then turn over 
to the police. But more telling is Baltimore Dept. of Social 
Servs. v. Bouknight, 493 U.S. 549, 554-55 (1990). In that 

case, a woman was ordered to turn over a child whom she was 
believed to have abused and who was last seen in her custody. 
The Court held, among other things, that the woman "cannot 
claim the privilege based upon anything that examination of 
[the child] might reveal."

 Thus in Bouknight it was not the body of the accused that 
was used as a form of evidence, but the body of another. 
Documents are exactly analogous: physical objects the exami-
nation of which yields evidentiary value or clues. Documents 
do, of course, represent the concrete embodiment of mental 
activity, but that is a false lead: these thoughts (the contents 
of the documents) were, we assume, put to paper quite 
voluntarily--if they were not, they would unquestionably be 
protected. See Doe, 465 U.S. at 610-11. In Bouknight the 
Court was obviously indifferent to the necessity that the 
suspect find and turn over a child whose location was com-
pletely unknown to the government; the court here should be 
equally indifferent to the necessity that Hubbell do the same 
for documents.

 Delivery of the child in Bouknight clearly depended on the 
suspect's exercise of her mental faculties; in fact, her intellec-
tual efforts turning up the child were no less then they would 
have been had the government known its whereabouts in 
advance. The case thus flatly contradicts the majority idea 
that self-incrimination occurs whenever the subpoena "re-
quires the exercise of an individual's mental faculties." The 
majority might say, with internal consistency though not with 
conformity to the cases, that the government may use the 
product of forced mental exercise so long the mental exercise 
is no more than an automaton's execution of intellection 
already carried out by the government. But that would take 
it to the position that a document subpoena must itself set 
forth whatever descriptive detail is necessary (under the 
majority's murky test) about the documents' character and 
location. Even the majority evidently recoils at this absurdi-
ty.

 There are of course non-physical aspects to the production 
in Bouknight. In another part of that opinion, the Court 


used a different analysis for the suspect's "implicit communi-
cation of control over [the child] at the moment of produc-
tion," 493 U.S. at 455, saying that although this was arguably 
an incriminating "testimonial assertion," id., some uses of it 
might be permissible under the doctrine that the Fifth 
Amendment may not be invoked to resist compliance with 
certain types of regulatory regimes, id. at 555-62. Here, of 
course, the government has no interest in Hubbell's control of 
the documents at the moment of production, and seeks to 
draw no inferences from that control. But the majority's 
concern here with information about the documents before 
their delivery is utterly different from the Bouknight Court's 
focus on "the moment of production."

 * * *

 The majority's confusion is further evident in its attempt to 
draw some distinction between whether something is "testi-
monial" and whether it has "testimonial value." See Maj. at 
42 n.27, 45-46 n.31. This dissent, the majority argues, 
wrongly frames the former rather than the latter issue as the 
key. Putting aside such issues as whether this terminological 
difference makes sense--if something is not "testimonial," its 
"testimonial value" is obviously zero--or is to be found in the 
cases--Fisher, for example, simply refers to "the more diffi-
cult issue[ ]" of "whether the tacit averments ... are [ ] 
testimonial," 425 U.S. 410--the actual analysis endorsed by 
the majority is not much different from the analysis in the 
"Foregone Conclusion" section above. The majority writes:

 Where the government need not rely upon the truthtell-
 ing of the witness, because it has prior knowledge of the 
 information that will be communicated through the act 
 of production, 'no constitutional rights are touched.'

Maj. at 46 n.31 (emphasis added) (quoting Fisher). The only 
disagreement here is the italicized portion: for some rea-
son, the majority believes that possession of "prior knowl-
edge" is the only circumstance in which the government 
"need not rely upon the truthtelling of the witness." But the 
majority never explains how, under its theory, there is no 

testimonial self-incrimination if the government need not rely 
because it already knows, while there is testimonial self-
incrimination if the government has another reason for dis-
pensing with reliance on communicative aspects of the wit-
ness's acts. Nor could any such explanation be consistent 
with precedent. In Bouknight, which concerned a subpoena 
to turn over a missing child, the Court found that the target 
could not "assert the privilege upon the theory that compli-
ance would assert that the child produced is in fact [the child 
sought]" because that fact was one "the State could readily 
establish," 493 U.S. at 555, despite the fact that the govern-
ment could not have made such a finding until after the 
production.1 Here, too, the government need not rely on any 
communicative or testimonial aspect of Hubbell's act of pro-
duction; once it acquired the documents, their intrinsic value 
evidently served its purposes quite adequately. The majority 
imposes a wholly artificial and impermissible limitation on the 
reasons for which the government "need not rely" on testimo-
nial implications of the act of production.

 * * *

 For a district judge, the challenge of the majority's view is 
to determine the "quantum" of relative prosecutorial igno-
rance that triggers a self-incrimination violation. Prosecutors 
know that businessmen keep business records (just as they 
know that living humans have blood and literate persons have 
handwriting); this is plainly too little information for the 
majority. But evidently the prosecutor need not have ad-
vance knowledge of the details that he is interested in. See 
Maj. at 54. Somewhere in that range is an imaginary line 

__________
 1 The majority appears to believe that this fact--the match of the 
child produced to the child sought--was a "foregone conclusion" 
because "presumably his social worker could testify as to his 
identity." Maj. at 43 n.27. This indicates either that the majority's 
definition of "foregone conclusion" includes things that only become 
apparent after the production itself--in which case the majority has 
no reason to disagree with this opinion--or that the majority 
believes that there is some way in which one can "readily establish" 
the identity of a person or thing that cannot yet be inspected.

which, unlike the equator, can never be fixed or defined with 
clarity. Henceforth, therefore, the operational meaning of 
the "act of production" doctrine in our circuit will largely turn 
on district courts' discretion in this metaphysical classification 
of prosecutors' knowledge.

 Though recognizing that no other court has applied its 
mind/body distinction explicitly, the majority claims that the 
existing lower-court cases can be lined up to fit. If so, this 
seems to me only because the factual detail of the cases is so 
skimpy and the majority's test so elastic. And to the extent 
that the cases can fairly be viewed as embracing the majori-
ty's readiness to squeeze production immunity into a simple 
"foregone conclusion" analysis, they miss the point. "Fore-
gone conclusion" is just one species of one part of the 
doctrinal structure the Supreme Court has set out; the 
majority's obsession with that phrase diverts its focus from 
the key issue, the presence (or absence) of "testimonial" 
incrimination.

 Let us return to blood and handwriting, the contexts for 
the key decisions underlying Fisher. Of course live humans 
have blood; of course literate humans have handwriting. 
These propositions are virtually true by definition. But the 
interesting data from blood and handwriting sample--blood 
type, DNA information, handwriting idiosyncrasies--are 
characteristically unknown to the government in advance. 
The admissibility of these data stems not from the govern-
ment's advance knowledge of the obvious, but from two 
propositions: (1) the critical information extracted from the 
witness (DNA and blood type, handwriting idiosyncrasies) is 
non-testimonial in character, see Fisher, 425 U.S. at 409, and 
(2) the prosecutor's knowledge of the link between the wit-
ness, on the one hand, and the blood and the handwriting, on 
the other, is independent of the communications that are 
implicit in the witness's giving blood or handwriting. Here, 
similarly, the documents' informational content (the equiva-
lent of the DNA, etc.) is non-testimonial in character, and the 
Independent Counsel is interested in the documents' link to 
the witness only insofar as it is shown by the contents of the 
documents.


 * * *

 Sensibly construed, the act of production doctrine shields 
the witness from the use of any information (resulting from 
his subpoena response) beyond what the prosecutor would 
receive if the documents appeared in the grand jury room or 
in his office unsolicited and unmarked, like manna from 
heaven. See DOJ Amicus Br. at 42; Alito, supra, at 59-60. 
The prosecutor would in such a case not be able to identify, 
verify someone's control over, or authenticate the documents 
except to the extent their own contents--or other sources--
did so. He would thus make no use of any testimonial aspect 
of the act of production. Yet, like DNA and handwriting 
idiosyncrasies, the contents would themselves be unprotected, 
except to the extent that deciphering might depend on the 
context of the subpoena--the information conveyed by the 
suspect's implicit matching of them with the subpoena de-
scription.

 This distinction between contents and production is appar-
ently missed by the majority. Its first hypothetical of the 
murder weapon claims that this "manna from heaven" theory 
would allow the government to compel a suspect "to incrimi-
nate himself verbally" by revealing the location of the murder 
weapon. But in the majority's hypo, the weapon is obviously 
the fruit of poisoned testimony: a revelation under compul-
sion. A more apt instance would be if a suspect had previous-
ly--without compulsion--written down the location in his day 
planner, and the government subpoenaed the planner. The 
production of the day planner, like the production of a 
missing child, is compulsory but non-testimonial. The much 
more harmful contents are obviously testimonial, but they are 
not the fruit of any unlawful compulsion (so long as the 
government's use is independent of the context of the subpoe-
na).2

__________
 2 The majority's second hypothetical, see Maj. at 62-63, is too 
imprecise to bear much analysis, but if it posits that the government 
in fact relies upon the communication implicit in the defendant's 
delivery of the murder weapon to link it to him, then that weapon 
must of course be excluded. Moreover, the hypothetical subpoena 

 On remand the only question should be whether the Inde-
pendent Counsel complied with the limits set by the above 
principle. Accordingly, I dissent on this issue.

__________
might well be invalid for being "unreasonable or oppressive," Fed. 
R. Crim. P. 17(c)--a defect unrelated to self-incrimination.